[S. F. No. 6420.    Department Two.—June 8, 1915.]

## EDWARD H. HORTON, Respondent, v. REMILLARD BRICK COMPANY (a Corporation), Appellant.

CONTRACTS—PERSONAL SERVICES—BONUS ON ANNUAL PROFITS.—One who enters the service of a corporation for a term of years under a contract determining his salary and providing that in addition he shall receive a bonus upon the yearly profits of the business, varying according to the extent of the profits, is entitled to recover a bonus computed upon the business at the end of the first year, notwithstanding that the services are terminated before the time limited in the contract and that he had not requested such bonus after a number of years' services until the cessation of his employment.

ID.—DEPRECIATION.—As a basis of such calculation the inventory made up in part by the various employees of the company, following the custom used by the company for many years, was held sufficient in the light of the evidence before the court, and there was no error in not including in such inventory an item of depreciation under the circumstances here shown.

ID.—ESTIMATED PROFITS.—Under the contract shown the profits referred to are construed to be estimated profits.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. William H. Waste, Judge.

The facts are stated in the opinion of the court.

Sullivan & Sullivan and Theo. J. Roche, for Appellant.

Wright, Wright & Stetson, for Respondent.

THE COURT.—Upon consideration of the petition for the hearing of this cause before this court, after decision in the district court of appeal, this court, while well satisfied with the soundness of the reasoning and conclusions reached by the court of appeal, in all other respects, considered one question of sufficient gravity to justify further consideration of it here. That question was whether under the terms of the contract between Horton and the defendant the profits were to be the *actual* profits, or whether by convention and agreement it was understood that the profits should be *estimated* profits. The point becomes one of great importance in the case because it was shown that, while in the statement estimating the profits the bricks of defendant carried over into the year 1908 were appraised at cost, they were, owing to business depression, sold for much less than cost in 1908. We are, however, convinced that the court of appeal was right in the conclusion it reached upon this question, and that under their contract the parties agreed to an annual estimate of profits as the basis of plaintiff's claim for compensation. The opinion and decision of the district court of appeal is therefore adopted as the opinion and decision of this court, and the judgment and order appealed from are affirmed. The opinion and decision is as follows:

"Chipman, P. J.: This is an action to recover a certain share of the net profits earned by defendant in its business

for the year 1907 and is based upon a written contract between plaintiff and defendant bearing date December 14, 1906. The essential part of this contract reads as follows:

" 'The party of the second part agrees to enter the employment of the first party and to continue such employment until the 14th day of December, 1916, he to discharge such duties as may reasonably be required of him by the directors of first party; second party agrees during the said period to devote his time during business hours, his best abilities and energies to the business interests of the first party; first party hereby agrees to employ second party for said period and as compensation for such services to be so rendered first party promises to pay to second party a monthly salary, same to be at the rate of three hundred dollars per month, from date hereof to the 1st day of January, 1907, and thereafter at the rate of five hundred dollars per month, same to be paid at the end of each current month, first party further agrees in addition to the monthly salary as hereinbefore specified to pay to second party for further compensation for such services a bonus upon the yearly profits, if any, of the business of the first party, after December 31st, 1906, that is to say, if commencing January 1st, 1907, the annual net profits on the capital invested in the business of party of the first part equals twelve per cent, party of the first part agrees to forthwith pay unto party of the second part a bonus of twelve hundred dollars, and if.such annual profits exceed said twelve per cent, then the bonus to be paid by first party to second party shall in addition to said twelve hundred dollars be the sum of six hundred dollars for each additional one per cent profit above said twelve per cent. It being understood and agreed that as a basis for the estimation of said profits the capital invested in the said business shall be taken at the sum of four hundred and eight thousand one hundred and sixty-seven dollars in accordance with inventory as shown by the closing of the books of said business December 31st, 1905.'

"The cause was tried by the court without a jury and judgment passed for plaintiff for the sum of four thousand eight hundred dollars, with interest from January 1, 1908. Defendant appeals from the judgment and from the order denying its motion for a new trial.

"The court found that, for the period commencing January 1, 1907, and ending December 31, 1907, 'the defendant's annual net profits on the business transacted during that period, based on the capital invested in its said business, to wit, the sum, of $408,167.00, amounted to the sum of $74,806.09, being over 18% upon the amount of such capital' and by reason thereof there became due plaintiff, on January 1, 1908, the sum of four thousand eight hundred dollars 'as a bonus upon said yearly profits for the year 1907,' for which the aforesaid judgment was given. It seems not to be disputed that plaintiff's bonus amounted to the sum awarded him if the court was justified in finding that the net profits of defendant's business for 1907 were correctly arrived at.

"Some errors are assigned arising out of rulings of the court in receiving and refusing evidence but the principal errors complained of relate: 1. To the construction placed upon the contract by the trial court; and, 2. To the method adopted in making up the inventory of defendant's property for 1907 and its influence upon the profit and loss account.

"It is contended by defendant that 'the contract was entire —if profits of one year were offset by losses of other years intervening before suit on the contract, plaintiff could not recover.'

"As to the inventory for 1907 the claim is that it made no allowance for depreciation; 'that the proven business custom of making annual allowance for depreciation of plant and equipment was the law of Horton's contract and regulates his rights.'

"We find these two objections at the threshhold of the discussion. If the trial court was wrong in disregarding the results of the business for subsequent years up to the time plaintiff ceased to be employed under the contract, prejudicial error is shown, because had the net profits of 1908 and 1909 been considered together with those of 1907, the combined result would not have warranted the judgment.

"Upon the second proposition, the net profits for 1907 depended largely upon the integrity of the inventory for that year and unless it was unassailable the profit and loss account would lack a proper or correct basis.

"Defendant became incorporated in December, 1879, the business having been carried on previously by Remillard Brothers, the owners of four-fifths of the stock in defendant

at its incorporation. The capital at this time, as shown by the articles, was two hundred thousand dollars, which had increased, when the 1905 inventory was taken, to $408,167.00. The company owned considerable real estate at different points where its brick yards were located and elsewhere, some farming land and some city land in Oakland and Alameda, besides the equipment for three large brick yards and their kilns. It was engaged chiefly in manufacturing brick and dealt also in lime, plaster, and cement and carried on some farming in a small way. In part its operating property consisted of wagons, horses, harness, steam propelled schooners, steam engines and boilers, electric motors, locomotives, brick moulds, brick machines, steam pumps, dump carts, kilns, blacksmith shops and equipment, numerous tools, railroad tracks and cars and many other articles used in the business. The buildings used were many and of considerable value. Without further enumeration the foregoing will indicate the character of the property entering into the inventory.

."On August 9, 1906, an executive committee consisting of three directors was created 'with full authority to have charge of all details as of the company business, and making any and all alterations, changes, and improvements in detail as to the systems or methods, etc., in their judgment desirable.' This was about one month after Horton had entered defendant's employment. He had been chosen as one of the directors and he, with Messrs. Metcalf and Gelinas, were made the members of this executive committee. On December 13, 1906, by consent of more than two-thirds of the stockholders, among them Cordule Remillard, 1020 shares; Charles Simard, 30 shares; J. P. Gelinas, 5 shares; E. H. Horton (plaintiff), 40 shares; Lamoreux estate, 200 shares; George D. Metcalf, 5 shares; P. H. Simard estate, 100 shares, and Maria Biltz, 50 shares, the by-laws of the corporation were amended. The amendments provided that 'the board of directors shall, when in their judgment it is to the interest of the corporation so to do, have power to enter into a contract of employment with any of its agents, superintendents, managers, or other employees, for a definite period not exceeding ten years, provided that before such contract shall become binding upon the corporation, it shall be ratified at a duly convened meeting of the stockholders.' Plaintiff was at this time a director. The contract involved in the action

was made eleven days later (December 14, 1906), and was signed for the corporation by Geo. D. Metcalf, president; J. P. Gelinas, secretary, and by E. H. Horton in his own behalf. The validity of the contract is not disputed and there is no evidence that in its making the company was over-reached or deceived by plaintiff in any way. At the meeting of the stockholders February 4, 1907, plaintiff was elected a director for the ensuing year, together with Mrs. Remillard, Messrs. Metcalf, Gelinas and Simard, and, at the meeting of the directors, held later, on that day, Horton was elected president and manager. Plaintiff, as he testified, entered defendant's employment 'about July 1, 1906, and continued in such employment until April 1, 1910.' The minutes of March 18, 1910, read: 'Resolved that for good cause, the services of Mr. Edward H. Horton are hereby dispensed with.' Nothing in the record shows the reason for this action. It appeared that plaintiff made no claim for any bonus until after he was discharged. Other facts in the case will be noticed as occasion may require.

''Turning now to the contract and in response to appellant's contention first above stated, it seems to us that it was not contemplated by the parties that Horton's bonus, should there be any, was not to be enjoyed until the end of ten years, nor was it based upon a full accounting of profits and losses as they might appear at the end of the period for which he engaged his services, nor at the termination of his services at a period less than ten years. We have nothing to do with the cause of his quitting. For the purposes of this case his services terminated by mutual consent and, if not, nothing appears in the record which would prevent his having his rights determined under the contract in accordance with what may seem reasonably certain to have been the intention of the parties in making it.

''The contract provides that plaintiff was to receive five hundred dollars salary, 'to be paid at the end of each current month,' and 'in addition to the monthly salary' he was to receive 'for further compensation for such services, a bonus on the yearly profits, if any, of the business . . . that is to say, if commencing January 1st, 1907, the annual net profits on the capital invested . . . equals 12%, party of the first part (defendant) agrees to forthwith pay unto party of the second part (plaintiff) a bonus of $1,200, and if such annual

profits exceed said 12%' he was to be paid an additional bonus of $600 for each additional 'one per cent profit above said 12%.' It seems to us that if the parties contemplated measuring the profits by the result shown only at the end of the ten-year period they failed so to express their intention. The language used indicates that the net profits were to be ascertained annually for the purpose of determining whether Horton should receive annually, 'for further compensation for such services,' the bonus provided for. The object was to stimulate his activities by promising a bonus on a certain definite sum should he succeed in producing a certain definite result annually. If he made the company earn twelve per cent annually upon a certain capital fixed by the company, he was to receive annually one thousand two hundred dollars, and for each additional one per cent over twelve per cent he was to receive six hundred dollars. The profit sharing feature of Horton's contract must have been intended as an inducement to him in engaging his services for ten years and it hardly seems reasonable to suppose that no bonus was to have been allowed him until the expiration of the ten years and then only upon a showing that he had earned as net profits for the company each year at least $48,980, or twelve per cent, on a fixed capital the earning capacity of which might in the course of events greatly diminish. The contract may be regarded as entire in respect of the term of Horton's service and at the same time reasonably construed to mean that he should be paid the bonus promised at the end of any year when earned. In using the word 'forthwith' in connection with the payment of the bonus when the annual net profits equals twelve per cent, we think it fair to assume that the bonus was to be paid whenever in any year the net profits on the fixed capital amounted to the sum named. Nor can it be reasonably said that a contrary construction should be given the contract because Horton made no claim for bonus until he was discharged. There is nothing in the record tending to show that this delay in making his claim was intended as giving a construction to the contract.

"Appellant cites certain cases in support of its contention, reliance being placed particularly upon *Thomas* v. *Columbia Phonograph Co.,* 144 Wis. 470, [129 N. W. 523, 524]. Re-

spondent cites *Jennery* v. *Olmsted,* 90 N. Y. 363, as fully sup-
porting his contention.

"In the Wisconsin case the question arose upon the construc-
tion of a contract reading as follows: 'May 7, 1904. Con-
firming my personal interview of this date with you, you
are hereby appointed manager of our Milwaukee office to take
effect May 1, 1904, at a salary of $25 per week, with a com-
mission of one-half (½) of one per cent (1%) on the cash
receipts of your office from sales, and ten per cent (10%) of
the net profits of the office up to a total profit of $2,000 per
month; and thereafter on the basis of five per cent (5%)
of such profits; the profits in question to be determined at
and by our executive office, and notice thereof to be duly sent
you by such office as determined by them.' .

"It appeared that plaintiff entered upon the performance
of his services May 1, 1904, and continued until early in the
year 1908. Each month he sent a report to the executive
office of the cash receipts during the month from sales at
the Milwaukee office and received from the executive office a
statement showing receipts of the office, certain deductions
therefrom and the net profits for the month on which his
commission was to be based. The court held that 'the true
construction of his contract is that the fixed period for com-
putation of net profits is the month, but that the real period to
which net profits refer is the period of plaintiff's service.'
Said the court: 'And this is the construction which the par-
ties themselves have put upon the contract as shown by com-
petent evidence consisting of monthly statements rendered to
the plaintiff and the statement of commission account from
May 1, 1905, to July 31, 1906, also that of March 5, 1907, in
which the net profits of one month were offset against the
losses of other months. The plaintiff acquiesced in this mode
of computation.' The opinion concludes as follows: 'On
the whole case there is nothing to go to the jury, no disputed
issue of facts, merely the construction of the written contract
and the effect of subsequent written statements upon the
practical interpretation given it by the parties. The plain-
tiff showed no right to recover on the evidence.'

"It is not possible to say how far 'the effect of subsequent
written statements upon the practical interpretation given it
(the contract) by the parties,' influenced the minds of the
judges in their construction of the contract. Indeed, the

parties themselves having given a practical interpretation to
the contract the court would have been fully justified in fol-
lowing it without attempting an interpretation of its own.

"The New York case was where defendant Olmstead entered
the service of the Saratoga Savings Bank as actuary, August
19, 1867, under a contract the only part of which appearing
in the report was as follows: 'that as compensation for his
(Olmstead's) services in that capacity (general actuary) he
receive such sum or sums from the net profits of the institu-
tion, as such profits, after paying all incidental expenses, may
warrant, not to exceed $1,000.00 per annum.' It appeared
that Olmstead's services were terminated about January 14,
1873. The action was by the assignee of the bank upon Olm-
stead's bond against him and his sureties, growing out of cer-
tain funds drawn out by Olmstead about January 1, 1873,
which the bank claimed was in excess of his earnings. The
trial court found, in the accounting, that, on July 1, 1869,
the bank had earned $648.43 net profits, but for the purpose
of fixing the sum to which Olmstead was entitled, the court
took into account the whole period of five years, during which
he was in the bank's employment, not making annual rests,
but reducing the profits of one year by losses in a subsequent
year, and this method of computation was sought to be justi-
fied on the ground that the contract was entire for the whole
period of service and that nothing became due to Olmstead
until the expiration of his employment, however long it
might continue. This was held not to be a reasonable con-
struction of the contract. Unfortunately, the report does not
disclose whether or not Olmstead engaged his services for
any definite period of time which makes it of uncertain appli-
cation here. However, it was said on appeal: 'The natural
interpretation of the transaction, is that the bank was willing
to pay a salary of one thousand dollars a year, out of the
net profits of the year, and Olmstead was willing to serve,
taking the hazard of the profits being sufficient to pay his
salary. If profits were not earned, he would get no compen-
sation, and it would not become a charge on future earnings.
If earned, he was entitled to be paid, and the bank could not
charge against the profits of one year, the losses of a suc-
ceeding year. We think therefore the court erred in not
crediting him with the whole profits of 1869. . . . Nor does
the fact that the defendant Olmstead did not credit himself

with the year's profits at the time, or other circumstances show a practical construction of the contract contrary to its natural meaning.'

"Without regard to the light which may be thrown upon the question by these cases, we think the construction given by the trial court to the contract here involved was justified by the language used in the contract itself and that the court properly confined itself to the profits for the year 1907.

"We are next to notice appellant's point that the inventory of 1907 made no allowance for depreciation of plant and equipment and this although plaintiff had, as is claimed, said that such depreciation was customary and would be made by him.    There was evidence that before this contract was entered into and while plaintiff was in defendant's employment he gave it as his opinion that there should be made in the books of the company depreciation of the plant and equipment.    Witness Gelinas, secretary of the company, testified to a conversation he had with Horton 'shortly after he became connected with the company.'    'Mr. Horton said that all manufacturing companies allowed so much for depreciation annually and as near as I can remember, I think that he fixed it at about ten per cent.    He said that an allowance for depreciation should have been made by the Remillard Brick Company in the years prior to that time.    He recommended that on his coming into the company.    He said that it was the custom of manufacturing companies.    I gathered from what he said that that would be the method pursued hereafter.    He said that it was customary, that it was generally done with manufacturing concerns and he wanted to know why we had not done it prior to that time.'

"Witness Miller, defendant's bookkeeper, testified: That Horton became connected with the company in July, 1906. 'Subsequent to that time I had several talks with Mr. Horton on the subject of depreciation of the property and plant of the defendant.    To the best of my recollection we had one of these conversations in the latter part of 1906.    Mr. Horton, in looking at things, explained to us that in his business in San Francisco he had written off so much for depreciation every year. . . . To the best of my recollection he said that that was what he proposed to do with Remillard Brick Companys' affairs and with their plant.    To write off a cer-

tain amount to "Profit and Loss" for depreciation every year which I am pretty sure he said would be ten per cent.'

"Witness Walker, superintendent of brick yards and sales agent, testified to conversations he had with Horton in which the latter said that 'the inventory of 1906 was incorrect, that it should have been depreciated and that it was the mode of procedure of manufacturing concerns to depreciate their inventory, and now since he had become identified with the company he proposed to depreciate that inventory about ten per cent until he had marked it off to what he called velvet. . . . The reason that he gave for his intention to mark off for depreciation was, that that was the mode of procedure in all manufacturing business.'

"The claim of defendant is that when the inventory for 1907 was made not only was it the custom among manufacturing concerns to depreciate articles in their inventories, but that Horton had agreed so to make defendant's inventory and that this understanding as well as the custom entered into and formed part of the contract sued upon. The trial court had Horton's version of these conversations before it and what he did in the matter and why he did it. Horton testified:

" 'Sometime in September, 1906, I had a conversation with Mr. Walker on the local train in Oakland. I told Mr. Walker that I had been talking with Mr. Gelinas about the inventories. I mentioned that I noticed that each year for the past years the brick kilns had been taken at the same price and that Mr. Gelinas had said that Mr. Remillard considered that was all right, because the kilns were kept in first-class repair annually, and that they did not depreciate with age. That they were as good at that time as when they were built, and further than that Mr. Walker said that kilns were built at a time when the price of labor was very low and that they would cost a very much higher price to build them at the present time, and therefore Mr. Remillard thought that the price that he set upon them was right. Mr. Walker further remarked that at about what the price of labor would be at the time we were talking that the kilns were worth all that they were taken at. I said that the items of machinery and many other things were held by the company at the same price from year to year in the annual inventory. Mr. Walker said that everything had been kept up in first-class

condition and that Mr. Remillard had always put those prices
in the inventory up to the time of his death because as Mr.
Remillard said, he considered them fair prices and that the
increase in the value of the real estate would more than offset
any depreciation. Mr. Walker said that there was a great
increase in the value of the real estate. I said to him that
his statements agreed with what Mr. Gelinas had told me. I
do not remember of Mr. Walker being there at any time
when I was writing up the inventory. I was a part of two
or three days in making up the inventory of 1907. I made
up that inventory in my office and partly at home nights.
I assisted in making the inventory of 1906 at Mr. Gelinas'
request and the prices for that inventory were obtained from
Simard, Gelinas, and Walker, Harry Walker and Frank
Miller. Simard was general superintendent of the three
brick yards of defendant. Harry Walker was a salesman
and shipping clerk in the Oakland office, dispatcher of teams
and had general supervision over the stable. I did not sug-
gest the declaration of the twenty-five thousand dollars divi-
dend of the corporation under the resolution of January 21,
1909. I had a conversation with Mr. Gelinas with reference
to the inventory of 1906. I told him that there were certain
inventory prices, particularly the prices on the kilns, that
had been taken at the same amount each year and I asked
him the reason. He replied by saying that they were built
years ago at a time when labor was cheap, that they had been
kept up annually in first-class repair. He said they were as
good to-day as ever. That at the present time it would cost
more to build them than what they were inventoried at. He
said that as to other items, they had been passed upon by Mr.
P. N. Remillard and as everything had been kept up in
good condition, the various articles had been inventoried for
that reason at the price indicated. He said as an offset to
that some of their properties had increased largely in value.
He said that the three-quarter block bounded by Second,
Third, and Clay streets at Oakland, increased in value which
would more than offset any depreciation in value in other
articles. I said that I thought he was right. That it was a
family concern and a close corporation, and that such course
was very often pursued by such corporations. He said that
the water-front property that the company had just previ-
ously purchased was a good purchase and that it would be

very valuable in the course of time. That the company should have bought it years before when they could have bought it for a very low figure as compared with the price for which it was purchased. This was about all that he said in that conversation.'

"Further explaining his connection with the 1907 inventory, speaking of a conversation with Mr. Gelinas, he testified: 'I had a conversation with him in January, 1908, as to the inventory of 1907 brick. I told him that the brick had been taken in the inventory of 1907 at their cost as figured out by Mr. Frank Miller. He said that he thought Miller's cost was all right, because Mr. Miller said that he had checked back and proved all of his figures which were his costs. I did not make that inventory of 1907. I did not help figure the cost of brick in that inventory and I was not present when Miller figured the cost of brick.'

" 'In December, 1907, Mr. Gelinas said that it was a busy time of the year and asked me to assist them with some of the work. He asked me to write out the inventory for them.' He further testified that he had a conversation with Mr. Miller in the fall of 1906 when he told Miller that in his business 'we had a system of marking off depreciation and that everything had been marked off. That some houses had a way of marking off depreciation, some 5%, others 10%, others 15%.' He explained that he found, in looking over the books, 'that the manner in which they had been kept would not permit the profits to be shown on an individual article such as cement, lime, plaster and other items, that I thought they should be segregated so that the books would show as to whether we were making or losing money on those articles. . . . I told them we could deal with the subject of brick and other articles in the same manner.' He made similar suggestions as to keeping the cost of making green bricks, the cost of burning the bricks and delivering them to the cars. Also a separate account with the boarding house, another for the stable, and another for the real estate. The reform suggested by Horton in these particulars was carried out in making up the 1907 inventory, but while some articles were either depreciated or no value at all carried out, other items as they appeared in the 1906 inventory were carried into the 1907 inventory without change, following what had been the method pursued by the company in previous years—

the method adopted in making up the 1906 inventory which
was taken as fixing the capital· on which Horton was to earn
his bonus.

''We think the evidence was such as left the trial court at
liberty to reject the claim of defendant that there was any
agreement between plaintiff and defendant as to the method
to be pursued in making inventories. Nor was there evi-
dence of a custom as to depreciating inventories from which
the court as matter of law should have found had become a
part of the contract. There was testimony of expert account-
ants to the effect that many large and important manufac-
turing concerns in this and other countries very generally
depreciate their inventories annually, the ratio depending
upon the character of the business and of the articles inven-
toried, but not always the same ratio by concerns carrying
on similar business. In some cases the depreciation is made
upon individual articles, the ratio necessarily varying as the
character of the article varies in its tenacity, its actual value,
or as to its continued usefulness. In other cases the com-
panies make a certain horizontal depreciation on the entire
inventory. Appellant has with much industry brought to-
gether in its brief the opinions of many authors on this sub-
ject. But we find it hopeless to deduce any fixed, unchanging
rule of depreciation by consulting these writers on account-
ing. Professor Hatfield, of the chair of accounting, Univer-
sity of California, in his recent work on Modern Accounting,
differing with some other writers, very sensibly, we think,
says that the value of property must be the value to the owner
of a going concern. We quote, at page 80, his remarks upon
revaluations: 'Shall they be put down at the original acqui-
sition price or at some other valuation? If at some other
value, shall it be the current market price, the present value
to the concern, or the price they would bring in liquidation?
The general principle which, with various applications, is now
universally accepted, is: The inventory should be on the basis
of the value of the assets to the present ‛holder as a going
concern. The proper value is that which they have to the
holding concern, and not that which they might have to other
persons, whether these persons are ordinary customers, or
those who might bid in the assets at a liquidation sale.' At
page 134 the author says: 'Where the courts prescribe de-
preciation they have generally allowed the basis and, indeed,

the period to be left to the discretion of the company's authorities.' It is not possible to formulate a universal rule of depreciation which must as matter of law be followed by the courts. Companies have the right to establish their own method of arriving at their profits. One of the expert witnesses testified that where depreciation is charged against equipment at the end of the year it 'is part of the manufacturing and becomes absorbed in the cost of the article produced; it is a part of the cost of production, in other words, it is added to the cost value of the article produced, added in the inventory to the cost value of the article.' This illustrates how widely systems differ in making inventories.

"There is not sufficient evidence that the parties contracted with reference to the custom contended for by defendant. On the contrary, the inference would seem to be justified that if they had any custom in mind it was that of the company itself pursued about thirty years without variation. This disputed inventory of 1907 was the basis for the profit and loss account for that year. It was well known to the directors and it cannot be doubted that the executive committee knew all about it. The results were carried forward into the inventories and profit and loss accounts for succeeding years and there is no evidence of any objection having been made by the directors or the executive committee or the finance committee to the correctness of these accounts, and none at all until the question arose in this action. The integrity of the 1907 inventory is not to be discredited solely on the ground that plaintiff was president and manager and on a suspicion that he took advantage of his office to impose upon the company. Fraud or bad faith, or unduly inflating the inventory, or of having amended the by-laws permitting a ten-year contract, cannot be imputed to him without some evidence of it and there is none. Besides, it is not to be overlooked that the governing power of the corporation resided in the directors and ultimate responsibility was upon them. There was an executive committee charged with the duty of making 'alterations, changes and improvements in detail as to the systems or methods' to be adopted in conducting the business, and no change was recommended by this committee. The fact that the capital on which Horton was to earn his bonus was determined by the 1905 inventory, prepared in this previously adopted way, subsequently followed, would seem

to indicate that the company was content to abide by the old way of making inventories. These inventories contained many important items which would have disappeared long before had the depreciation method contended for been adopted. The kilns inventoried in 1906 and 1907, at the same value (one at $15,000, one at $18,000 and two at $20,000 each) would not have appeared at all as assets had they been depreciated annually even five per cent in previous years; and so of many other expensive parts of the equipment.

''The reason for this course, given by the company's officers, that there had been a large increase in the value of the real estate owned by the company which had not been carried into the inventories thus offsetting any apparent depreciation of the equipment, is by no means unsound. Then, too, it was shown that many perishable things were replaced and their cost charged to expense account—for example, brick moulds, it was testified, wore out in a season and were replaced yearly. A large number of horses was used for teaming purposes but the required number was kept full by purchase. So of many things which should be mentioned. The truth is that the rule of depreciation is largely theoretical and is adopted by merchants and manufacturers as a protection against being deceived as to their assets and in effect amounts often to accumulating what might not inaptly be called a surplus, if not in money, still in money value. As an illustration, we have these brick kilns. They passed into the inventories unchanged in value and were proven to be as good as new and to have an actual value of something like seventy-five thousand dollars, and yet, had the inventories been depreciated from the time they were built they would have stood on the books at one dollar long before 1905. Had all the items of equipment been similarly treated the books would have shown but few assets except the land, the outstanding accounts, brick on hand, and cash, and yet the company would have a completely equipped and operating plant worth many thousands of dollars. The rule of depreciating inventories no doubt has its advantages and the wisdom in following it is not to be questioned. It is very comfortable for a manufacturer to know that he has by his earnings been able to keep his plant running for ten years and, while he has depreciated his equipment annually ten per cent and until it stands on

his books at one dollar, he has made the plant earn enough to give him dividends equal to his original capital invested, pay the cost of running, repairs, and replacements and have remaining an active factory. This would be what Horton said was 'getting on velvet,' but we cannot see that his contract required of him any such accomplishment or that he promised to achieve it. It would seem altogether unreasonable for the court now to say that Horton ought to have instituted a new system of accounting, not contemplated by the parties—a system which if enforced in this action would deprive him of any bonus, and which would violate the principle upon which the basis of the company's capital rested. In short, the court is asked to hold that for the purpose of this case the alleged unscientific method of fixing the values found in the 1905 inventory shall stand unchanged as the measure of defendant's capital, but in ascertaining profits for 1907 a radically different method of fixing values must be adopted. Obviously, in all fairness, if we are arbitrarily to depreciate the inventory of 1907, we should go back and readjust the capital by treating the inventory of 1905 in the same manner. We can do neither, in our opinion, without violating the contract.

"We come now to consider some of the specific objections to the inventory of 1907 and to notice how and by whom it was prepared. We cannot hope to consider all the items entering into this inventory of more than one hundred exhibits.

"There were certain exhibits introduced by plaintiff, being respectively, 'Profit and Loss Sheet,' 'Surplus Sheet,' 'Assets and Liability Account of '07' and 'Surplus Account,' which showed the profits for 1907 to be $75,786.56. The trial court, rightly, as we think, admitted these exhibits (which showed the profits as just stated) on the theory that they constituted at least *prima facie* admissions by defendant of the profits of its business upon the closing of the books December 31, 1907. Plaintiff's contention as to depreciation, is 'that the annual statement of its business condition December 31, 1907, made by defendant and acted upon by it, must stand except in those particulars in which it has been shown to be in error by defendant's evidence.' At a meeting of the directors, held February 3, 1908, all present, 'the secretary submitted the regular annual statement of

the resources and liabilities of the company, which report, summarized, shows net results as follows:

Total assets, Dec. 31, 1907....................$567,284.39
Total liabilities ...............................  491,497.83

Net profit for year 1907..................$ 75,786.56
Attest: J. B. GELINAS, Secretary.'

"Plaintiff introduced the inventory of 1907 and some further exhibits of the proceedings of the directors and stockholders found in the minutes and rested. The court opened the door to defendant to dispute the correctness of this inventory and it is with defendant's objection and evidence in support thereof we are next to deal.

"Defendant introduced witnesses who testified to what in their opinion should be the depreciation on certain named kinds of property. With the exception of witness Smith and witness Walker, the other witnesses had no personal knowledge of the property. They simply testified to what the ratio of depreciation should be on the property found in the inventory. Smith visited the plant in January, 1911, and judging from its character and then appearance, he fixed a ratio of depreciation for 1907 on the buildings and some of the machinery. Walker was in defendant's employment and his testimony related to a number of articles, some he thought worthless, but none of them of much value. These witnesses thus testified as to wagons and harness; machinery, boilers and other things of that character in brick yards; the schooners operated in shipping bricks, brick machinery, boilers, engines, and other equipment; also as to the worthlessness and worn-out character of clay dumps, moulds, and some other articles in defendant's three brick yards, which were located at Pleasanton, San Jose, and Greenbrae.

"Witness Barber, an expert accountant, 'relying on the testimony of these several witnesses and not on any arbitrary annual rate or percentage of depreciation fixed by himself,' as stated in defendant's opening brief, 'prepared defendant's exhibit N,' showing the depreciation which should be made at these several yards and in equipment other than manufacturing—these latter including horses, harness, and wagons, the schooners, a hay cutter and electric motor.

"This exhibit 'N' bears the following caption: 'Estimated depreciation and obsolescence on equipment, etc., used in

connection with manufacturing, based on inventory of December 31, 1906.' The witness took the 1906 inventory and placed the then inventory value of the property in the first column; in the second the per cent of depreciation and in the third the amount. The plan of this exhibit was to ascertain the value of an item in the 1906 inventory, depreciate it as the witnesses had testified it should be and then depreciate the same item in the 1907 inventory to make it conform to his rule of depreciation. The exhibit shows that the witness wrote off values at rates from five to twenty per cent. Summed up the exhibit shows:

San Jose yard depreciation........................$ 4,067.51
Pleasanton yard depreciation....................  5,772.85
Greenbrae yard depreciation.....................  3,273.71
Equipment other than manufacturing at various
    yards ............................. ......... 3,737.80
 

    Total ....................................$16,851.87

Outbuildings and improvements he wrote off 5%. The kilns were depreciated 10% and most of the remaining items in about equal numbers were depreciated 10% and 20%.

He next wrote off, for clay taken from the land..$ 4,304.55
For rebates on sales of bricks in 1907.............   432.00
An item relating to 1906 business improperly cred-
    ited to 1907 business......................   333.05
Purchase of lime in 1907 not entered until 1908....   420.00
Two other similar items........................    99.20
Accounts of 1907 not collected...................  2,238.00
Difference in certain 1907 brick when valued at
    1906 rates ...............................  3,231.65
Error in misplacing a decimal in this brick item..  1,390.49
 

    Total ....................................$12,448.94
To these errors add depreciation................. 16,851.87
 

Gives total to be deducted from apparent surplus. .$29,500.81

"These figures reduce the profits below $48,980.00, which had to be earned before any bonus was allowed.

"Of plaintiff's connection with the making of this inventory we have already given some of the testimony. It was the work of Gelinas, Miller, Walker, Simard, and Revolta, all in responsible positions with the company, some of them stockholders,

assisted by Horton as explained by him. Horton was examined at great length, his attention being directed to the inventory, item after item. His testimony shows that the handwriting was by different of these persons and sometimes by himself; that the values were given by the persons apparently best informed as to the item, sometimes by one, sometimes by two or more and sometimes by Gelinas or another in consultation with Horton. As heretofore stated, the evidence was that some articles were depreciated to accord with their value but some also were set down at the value shown in the 1906 inventory. We do not, however, attach significance to these details further than that the evidence shows that the inventory was mainly the work of trusted employees of the company who had been long in its service and who were not only familiar with the property and its value, but were also familiar with the method adopted and practiced by the company for many years in making its annual inventories. We do not feel disposed to add much to what has already been said with respect to the contention that the trial court erred in not following defendant's proposed rule of depreciation. The evidence shows that the inventories had been taken upon a physical appraisement of the properties rather than by a horizontal depreciation method. As illustrating what was done, the inventory of the Oakland stable account, consisting of horses, wagons, harness, etc., may be given. The inventory of 1907 shows a depreciation of $1,175.00 as against the value of 1906.

"There is a fundamental error, it seems to us, in the basis of expert Barber's schedules. He proceeded on the assumption that the inventory of 1906 was a correct starting point from which to develop his method and ascertain values. The reason given by him was as follows: 'I used the inventory of 1906 as a basis of the valuation for the reason that the property purchased during 1907 might have been purchased so near the end of the year as not to be properly considered as having depreciated at all during that year.' This is not satisfactory. A very large per cent of the property had been in use many years and, as we have pointed out, should, on Barber's theory, long before have been written off. For example, he took the kilns as the valuation of 1906, whereas they had been in use more than twenty years. Most if not all the real estate was purchased prior to 1906 and it amounted to

more than one-third of the entire values. Obviously, if his method should be applied in making the 1907 inventory he should have started with one framed in accordance with his method inasmuch as he was dealing with plaintiff and his rights under the contract and not alone with the company's rights. It might not have mattered, if only the defendant was concerned, where and when he found his basis to work from; although, it seems to us, it would have been but fair to the company in starting a new system either consistently to keep in mind the old method or to begin with a physical appraisement of all assets. We have already seen that to apply Barber's method to the past years of defendant's business the capital of $408,167, on which Horton was to earn 12% net profits, before sharing in any surplus, would have been reduced far below the original capital with which the corporation started. Our conclusion, as to the schedule of depreciations prepared by Barber, is that it should be disregarded.

"Turning now to the schedule of miscellaneous items charged off, amounting to $12,448.94, let us discover whether there is merit in the claim. One of the large items of this schedule was $4,304.55 for clay used. Barber testified: 'The manner in which the entry was handled was such as to make its effect zero, the debit canceling any effect. I mean the credit cancelling the effect of the debit.' He testified, however, that 'there was no reduction made at the end of the year in the value of the real estate,' from which he concluded that there must be a depreciation made to the amount he finds the clay was worth. The answer to this is that the company had not in previous years depreciated the real estate on this account, and, in 1907, the old method of valuing the real estate persisted. The method adopted by the company applied alike to all its property. Furthermore, the expense account was burdened with the taxes and other expenses attending not only the land producing clay but all the real estate and its improvements in addition to such land, and there was a good deal of it. It was shown that the real estate had increased in value. These considerations would seem to account satisfactorily for the defendant's adhering to the values given in former inventories.

"The items—rebates on goods sold, $432.00; railroad rebates, $333.05; lime purchased in 1907 charged in 1908 at $420, and other similar items, $99.20, were, as we understand plaintiff's

reply brief, conceded as proper corrections. Of these purchases in 1907 ($519.20) Barber testified: 'There was a much larger amount of business charged in 1907 so as it more than offset this amount. I did not go much further into it.'

"Of the item, $2,238.00, uncollected personal accounts, Barber testified: 'A portion of that should have been used in reducing the profit account for 1907, and my figures show the amount that should be so charged.' Miller, defendant's bookkeeper, testified: 'I will say that giving credit to the 1907 account for the amount originated prior to 1907 and charged off during 1907, it would show a net balance of $458.98 that should still be absorbed in 1907. That sum should be charged off'—not, as we read Barber's schedule, $2,238.00.

The remaining item is                                    $2,261.67
to which is added error in the account                     1,390.49
making over valuation of brick in 1907 inventory as
compared with prices used in 1906 inventory, as we
understand the claim, the sum of                         $4,586.51
Barber's attention was called to this item on cross-examination and he corrected his testimony in chief as follows: 'I omitted to figure in some Oakland brick; taking this error, which amounted to $1,354.86, into consideration, the correct difference would be $3,231.37; that is to say, the brick in the 1907 inventory figured at the 1906 inventory prices would amount to $3,231.67 less than the figures appearing in the 1907 inventory, that is after taking into consideration the $1,354.86 error in that inventory, that is on the basis of figuring all the brick in the inventory.' We can see no reason why the brick should have been valued, in December, 1907, the same as in December, 1906, unless all the surrounding conditions were the same, which does not appear to have been the case. Horton testified that the market price of hard burned brick at San Francisco and Oakland at the end of 1907 was 'ten dollars per thousand, ex cars or dock, delivery to be upon freight cars or dock, at the expense of the parties sold to.' Hard brick was inventoried 1907 at $6.00 per M at the Pleasanton yard; at the San Jose yard, $6.178 per M, and at the Greenbrae yard, $6.385 per M. The average price at the three places combined was $6.18 per M.

"We have already quoted Horton's testimony in which he stated 'that the brick had been taken in the inventory of 1907 at their cost as figured out by Mr. Frank Miller. . . . Miller

said that he had checked back and forward all his figures which were his costs.' Horton testified: 'I did not help figure the cost of brick in that inventory and I was not present when Miller figured the cost of brick.' Barber ascertained from the books the total cost of burned brick to be $63,014.53 and the number on hand at close of 1907 to be 10,200,000, an average per M of $6.17, within less than one-tenth of a cent of the average inventory value.

"Barber figured the green brick, 10,715,000, cost, $34,435.36. Of these nearly one-half were inventoried at $2.728 per M; over one-third at $3.377 per M; nearly one-fifth at $4.146, an average but little more than Barber figured the cost.

"We do not think that the contention of overvaluation of the brick is sustained by the evidence. They were inventoried by defendant's bookkeeper at cost and we have shown that his estimate is so near that of Barber's as to make the difference negligible.

"Without going further into these accounts, we think it satisfactorily appears that when defendant is allowed the corrections or mistakes shown in its favor, which were sustained by the evidence, and some mistakes concededly in plaintiff's favor, the corrected profit is well within the amount found by the court.

"As to the claim that there was an overproduction for the year 1907 which should have been taken into account in figuring values, something in reply should be said. In round numbers, defendant had on hand, at the close of the year, twenty-two and one-half millions of bricks, about equally divided between burned and green. The amount carried over from 1906 was something over sixteen millions. It will be recalled that the great fire in San Francisco created an abnormal demand for building material, and, although in rebuilding, a much greater proportion of cement than ever before was used, still the demand for brick was large and the directors might reasonably have supposed it would continue. Bricks sold in 1907 as high as $13.50 per M. That a period of temporary depression later curtailed sales could not have been anticipated. Conditions so changed that, in 1908, the company manufactured no brick. But this reaction, which could not have been foreseen, cannot be invoked to affect conditions at the close of 1907. Defendant suggests that it is not a fair construction of the agreement 'to hold that defend-

ant should be required to pay Horton a percentage on the material of all properties remaining on hand at the end of the year 1907,' for example, this large quantity of carried over bricks. We think the quantity not abnormally great when the conditions are considered. As to its effect upon the accounts the quantity was immaterial. The cost of manufacturing the brick on one side of the account equalized the carried over value—the credit and debit entries neutralizing one another.

''We have endeavored to consider all the objections made to the findings and judgment which seem to call for notice and there remains to dispose of alleged errors in rulings of the court at the trial in refusing to allow certain questions.

''Expert witness Barber was asked several questions as to his opinion upon the correctness of the statement of profits. He was asked: 'Was your investigation of the books, records and accounts of the Remillard Brick Company for the year 1907 so thorough as to enable you to state what the profits of that business were for that year if proper accounting methods had been pursued?' He was also asked whether the account of profit and loss was correctly stated and some other similar questions calling for his opinion as to whether the 'surplus figures $75,786.56 is a correct statement of the corporation for the year 1907.' Objections that the questions were immaterial, irrelevant, and incompetent were sustained. We cannot see that the defendant was prejudiced by the court's refusal to accept the conclusions reached by the witness instead of its own upon a full consideration of the evidence and the law.

''All the facts were before the court and it then became its duty to decide the issues, and no rule of evidence or of law would compel the court to accept the opinion of the witness as to the conclusions to be drawn from the facts. It certainly was discretionary with the court to avail itself of the witness' opinion deduced from the evidence and in declining to accept it defendant was not prejudiced even if the testimony was admissible.

''But one further error of this character is called to our attention. Witness Barber was asked whether or not the bricks sold in 1908 were not on an average sold at a loss of $1.59 per thousand. Objection was sustained.

''The average price received in 1908 could only be ascertained in closing the books at the end of that year. If, as we have

held, plaintiff was entitled to the fruits of his contract as they appeared at the end of the year 1907, it was wholly immaterial what happened in the year 1908.''

Hearing in Bank denied.