[No. B195083. Second Dist., Div. Four. May 27, 2009.]

MAHSHID JAZAYERI et al., Plaintiffs and Appellants, v. DENNIS MAO et al., Defendants and Respondents.

**COUNSEL**

John Theodore Dean for Plaintiffs and Appellants.

Atkinson, Andelson, Loya Ruud & Romo, Edward C. Ho, Nancy Long Cole and James Palmer for Defendants and Respondents.

**OPINION**

**MANELLA, J.—**

## INTRODUCTION

In this action brought by appellants for breach of contract and fraud, the trial court excluded the bulk of appellants' documentary evidence on grounds of lack of authentication and hearsay. Concluding that appellants had failed to meet their burden of proof, the court then entered judgment for respondents. We conclude that the blanket exclusion was error, and that much of the evidence offered was adequately authenticated and was not subject to any legitimate hearsay objection. As set forth in greater detail below, certain documents qualified for admission as official records under Evidence Code section 1280, others as business records under Evidence Code section 1271,

and still others as admissions under Evidence Code section 1220 or adoptive admissions under Evidence Code section 1221.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Claims Presented*

Appellants Mahshid Jazayeri and her husband David Rashidian, doing business as R&A Ranch, brought suit against respondents Susan Mao, her sons Dennis and Eric Mao, and their company, Mao Foods, Inc. The complaint alleged that appellants were in the business of raising chickens for sale and that they and respondents entered into an agreement under which appellants were to deliver a certain number of "live healthy" chickens weighing between five and six pounds, and respondents were to pay 50 cents per pound for the live healthy chickens delivered. According to the complaint, the overall weight of the chickens delivered was to be determined by weighing the delivery trucks and cages before and after the chickens were loaded. The complaint further alleged that the parties understood that some chickens would be dead on arrival (DOA) or otherwise unusable as food. The number of dead or unusable chickens was recorded on poultry condemnation certificates (PCC's) issued by food safety inspectors working for the United States Department of Agriculture (USDA). Appellants alleged that the parties' contract permitted Mao Foods to deduct from the calculated weight of the delivered chickens the estimated weight of the DOA or otherwise unusable chickens. However, Mao Foods allegedly altered PCC's to show more dead or unusable chickens than were found by the USDA inspectors and, using the altered PCC's to justify their actions, deducted excessive amounts.

As separate claims, the complaint alleged that (1) respondents had at times unilaterally paid appellant less per pound for the chickens delivered than called for by the parties' agreement; and (2) after the weight of the live healthy chickens had been calculated in accordance with the procedures described above, respondents arbitrarily reduced it by deducting a percentage before calculating the payment due appellants. Appellants sought damages for both breach of contract and fraud.[2]

Shortly before trial, appellants filed an amended complaint clarifying that the parties' agreement was formalized in a series of written contracts covering the period between 2001 and 2004, the first signed in July 2001 and the last signed in April 2004. The amended complaint further stated that

---

[1] Unless otherwise indicated, statutory references are to the Evidence Code.

[2] Respondents filed a cross-complaint, but voluntarily dismissed it. No issues concerning the cross-complaint were raised on appeal.

respondents wrongfully refused to accept additional deliveries after September 20, 2004, resulting in a further loss to appellants of approximately $100,000 because appellants were unable to sell thousands of chickens they had purchased and fed in reliance on the agreement.

At trial, counsel for appellants represented to the court that appellants suffered five categories of losses, all essentially arising from respondents' alleged failure to pay the agreed price per pound for the chickens R&A Ranch delivered to Mao Foods between 2001 and 2004. First, appellants claimed damages based on the use of forged or altered PCC's to calculate the payments due. Second, appellants claimed damages based on the difference between the DOA count made by Mao Foods and R&A Ranch employees when the chickens were delivered and the count used by Mao Foods to calculate deductions.[3] Third, appellants sought damages based on Mao Foods's alleged unilateral decision to deduct a percentage from the weight of the chickens delivered before computing the amount due. Fourth, appellants contended that Mao Foods sometimes unilaterally reduced the price per pound it paid R&A Ranch from the agreed price to a lesser price. Fifth, appellants sought damages based on deliveries made for which no payments whatsoever were received.[4] Totaling the claims in all these categories, appellants estimated their economic damages at $67,879.74.[5]

B. *Evidence at Trial*

Jazayeri testified that she or her husband entered into a series of contracts on behalf of R&A Ranch to sell live healthy chickens to Mao Foods. The contracts, which were admitted into evidence, covered the period from

---

[3] As the DOA numbers were also written on the PCC's, the second category could have been subsumed by the first. However, to support the first category, appellants had copies of original PCC's obtained from the USDA to compare with the allegedly altered PCC's. By the time appellants first discovered the discrepancies, some PCC's had been purged from the USDA's files and were no longer available. Thus, although the first and second claim categories both included damages for deduction of excessive numbers of DOA chickens, the two categories were supported by different documentation.

[4] According to appellants' counsel, exhibits 5 to 23 supported appellants' claims based on altered PCC's; exhibits 24 to 66 supported the claims based on discrepancies in the DOA count where the original PCC's were not available; exhibits 67 to 118 supported claims based on Mao Foods's alleged unilateral write-down of the weight of the live healthy chickens delivered; exhibits 120 to 140 supported the claims based on payment of inadequate price per pound; and exhibits 141 to 146 supported the claims for deliveries for which no payment was ever made. Because appellants organized the exhibits based on the type of damage each supported, the documents for some deliveries appear more than once.

[5] Although appellants' counsel did not include this in the summary of claims discussed with the court on the first day of trial, during the course of the trial, appellants also presented evidence based on the thousands of chickens they had purchased and fed but were unable to sell after respondents terminated the agreement.

September 2001 to December 2004. The first agreement contained a provision which stated: "Downgrade or [p]arts missing after processing percentage not to exceed 15%."[6] The other contracts did not include that provision. All of the agreements specified that the chickens were to weigh between five and six pounds, but none specified the price to be paid per pound.[7]

Jazayeri testified that she was present on nearly every occasion when R&A Ranch chickens were delivered to Mao Foods's processing plant, which occurred approximately three times per week during the period the agreements were in effect. Jazayeri and/or the delivery truck driver brought with them at the time of delivery copies of weight slips—documents showing the laden and unladen weights of the delivery trucks, from which the weight of the chickens could be calculated—and purchase orders.[8] The purchase orders were prepared by Rashidian. On them, he wrote the date of the delivery, the number of cages and the number of chickens, which he had personally counted.

When the delivery trucks arrived at Mao Foods's processing plant, the cages containing the chickens were unloaded by an R&A Ranch employee. A Mao Foods employee—often Juan Mendes, the plant foreman—counted the cages and randomly counted the chickens in some of the cages to confirm the numbers on the purchase orders. Mao Foods employees then took the chickens from the cages and hung them for slaughter and processing on the production line. Chickens found already dead were put to one side and later counted by a Mao Foods employee in the presence of an R&A Ranch employee. The Mao Foods employee performing the count wrote the number of DOA chickens on a piece of paper—generally the purchase order, but

---

[6] Several witnesses explained that when chickens are processed, some of the parts are not usable due to damage or injury. Those parts are cut off and discarded, leaving the rest of the carcass to be processed. The witnesses referred to the unusable parts as "trim." Jazayeri understood that this provision permitted Mao Foods to deduct for trim, but only when the first contract was in effect.

[7] Jazayeri testified that the price per pound was negotiated periodically.

[8] The delivery truck drivers, who were not R&A Ranch employees, were responsible for having the trucks weighed before and after they were loaded and for giving a copy of the weight slips to Jazayeri. The weighing was performed by a third party truck scale or weighing companies, identified on the weight slips. One of the weighing companies used by R&A Ranch prepared two weight slips for every delivery truck, one containing the weight of the truck and the cages before the chickens were loaded and the other containing the loaded weight. The weight slips prepared by the other companies consisted of a single page on which was written the truck's laden and unladen weight, and a calculation of the net weight of the load.

sometimes on a blank piece of paper or on the freight bills or other documentation provided by the trucking company—and generally also wrote or signed his name.[9]

Jazayeri understood from her conversations with Susan Mao that Mao Foods would deduct the weight of dead or otherwise unusable chickens from the amount owed R&A Ranch. Jazayeri further understood that Mao Foods would deduct the weight of some of the chickens condemned by USDA inspectors.

Before leaving the processing plant, Jazayeri or the delivery truck driver gave copies of the purchase orders and the weight slips to a Mao Foods employee.[10] A few days after each delivery, Susan Mao would give to Jazayeri (1) a copy of a calculation sheet showing the amount due R&A Ranch for each delivery; (2) a copy of the PCC showing the number of DOA and condemned chickens; and (3) a check in payment for the live healthy chickens delivered.[11]

Susan Mao told Jazayeri she prepared the calculation sheets and Jazayeri recognized her handwriting on them. Jazayeri also recognized much of the information on the calculation sheets, including the date of the delivery, the number of chickens delivered and their total and average weight—based on the weight slips and purchase orders given to Mao Foods at the time of delivery—and the number of DOA and unusable chickens—based on the numbers on the PCC's given to Jazayeri by Susan Mao.[12] The calculation sheets included a computation of the total amount due, which was derived by multiplying the "billable weight" of the chickens delivered by a specified price per pound, which varied, but was generally in the 44 to 53 cents range.

When Jazayeri received the calculation sheets, she did not check the calculations and Susan Mao did not explain them to her. Jazayeri put the

---

[9] Many of the DOA counts in the exhibits offered by appellants were signed by "Juan Mendes." Jazayeri testified she was familiar with Mendes's signature.

[10] The purchase order forms consisted of two pages and carbon paper, so the copy of the purchase order given was a carbon copy and included the handwritten number representing the DOA chickens.

[11] Jazayeri testified that Mao Foods would often make an estimated payment on the day of delivery, so that the payment made on the date the paperwork was received would be for the unpaid portion of prior deliveries plus an estimate for that day's delivery. On some occasions, Susan Mao would deliver a check for several days' deliveries.

[12] Where the weight slip consisted of a single sheet and contained the truck weighing company's calculation of the net weight of the load, that figure appeared on the calculation sheets in a box labeled "weight of chicken." Where the weight slips did not contain the net weight calculation but consisted of separate slips for the laden and unladen weight of the delivery truck, the "weight of chicken" box on the calculation sheet contained a figure evidently derived from subtracting the unladen weight from the laden weight.

copies of the calculation sheets and PCC's given to her by Susan Mao and the weight slips and purchase orders or other documents indicating the number of DOA chickens in the files for R&A Ranch. The files were arranged by date of delivery.

In late 2003, Jazayeri asked the USDA inspectors who worked at the Mao Foods plant why the count for dead and condemned chickens was so high. The inspectors allowed her to compare a few of her copies of the PCC's provided by Susan Mao with the USDA "originals."[13] Jazayeri noted that the PCC's given her by Susan Mao showed higher numbers of DOA and condemned chickens than the USDA originals. Jazayeri confronted Susan Mao's son, Dennis Mao. Dennis spoke to Susan Mao outside Jazayeri's presence. Jazayeri overheard Dennis yelling and heard Susan say: "Dennis, Dennis, don't worry. I'll pay. I'll pay."[14] Jazayeri then spoke with Susan privately. Susan admitted she had altered USDA documents for all the growers and promised to reimburse R&A Ranch. A few days later, Jazayeri was called into a meeting with Susan, Dennis and Eric Mao. Eric said: "I'm sorry. My mom, she did that." Dennis promised to obtain unaltered copies of the PCC's from the USDA. A few months later, Dennis told Jazayeri she would have to make the request of the USDA.

In March 2004, January 2005 and November 2005, Jazayeri requested from the USDA under the Freedom of Information Act (FOIA; 5 U.S.C. § 552) copies of all the PCC's reflecting R&A Ranch deliveries to Mao Foods.[15] In 2004, when the first batch arrived, she compared them with the documents for each delivery given her by Susan Mao and found many discrepancies.[16] For example, the PCC for the December 26, 2003 delivery (exhibit 5) showed 40 DOA chickens; the USDA PCC showed 20 DOA chickens. The USDA PCC for the October 20, 2003 delivery (exhibit 7) showed 37 condemned chickens, including 9 suffering from septicemia and toxemia; on the PCC obtained from Susan Mao, the "3" in 37 was changed to a "5" and the number "2" was placed before the number "9," creating the impression that 57 chickens had been condemned, including 29 suffering from septicemia and toxemia. Jazayeri discussed her findings with Dennis Mao.

---

[13] As will be seen, the USDA kept a carbon copy of each PCC filled out at the time of the delivery. Carbon copies have traditionally been considered " 'duplicate originals.' " (See, e.g., *People v. Lockhart* (1962) 200 Cal.App.2d 862, 871 [19 Cal.Rptr. 719].)

[14] Jazayeri did not understand the entire conversation because some of it was in a language foreign to her.

[15] The FOIA request was offered into evidence as exhibit 187, but that exhibit was not included in the appellate record. Jazayeri explained that appellants sent additional requests in 2005 because some of the requested documents were not sent with the original response.

[16] The copies of the PCC's Jazayeri received from Washington had the number "04-375" on the bottom. She placed the documents she received from the USDA in her files.

Shortly after Jazayeri's discussion with Dennis Mao, by letter dated August 18, 2004, Mao Foods terminated the contract with R&A Ranch. The letter stated that Mao Foods would accept no further deliveries from R&A Ranch after November. After Mao Foods cancelled the contract, R&A Ranch was left with approximately 32,000 chickens it had purchased and fed but could not sell. To support these damages, appellants offered into evidence copies of the invoices for the purchase of chicks, which totaled approximately $16,000. Jazayeri estimated the cost of feeding the chicks at $40,000.

Jazayeri testified that she personally prepared the appellants' trial exhibits using the calculation sheets and PCC's given her by Susan Mao, the weight slips and purchase orders in her files, and the copies of PCC's sent her by the USDA pursuant to her FOIA requests.

### C. *Dr. Millare's Testimony*

Dr. Norberto Millare, a veterinarian, was employed by the USDA and split his workday between two poultry processing plants, one of which was Mao Foods's plant. Dr. Millare supervised the USDA inspectors who worked along the production line. The inspectors visually examined each chicken as it went through the line, instructing the workers to remove any chicken that fell into one of the categories on the PCC. Plant employees would, under the inspectors' supervision, record the number of chickens, if any, in each category on tally sheets. At the end of the day, using these tally sheets, the inspectors filled out most of the boxes on the PCC forms and also orally informed Dr. Millare if any of the chickens appeared to have been suffering from a serious disease.[17] After the inspectors filled out the PCC's, Dr. Millare signed them, unless he was unavailable that day, in which case they were signed by another supervisor.[18] Before signing, Dr. Millare checked the numbers written in the various boxes against the inspectors' tally sheets.

Four of the boxes on the PCC's—designated by asterisks—were not filled in by USDA inspectors and were blank when Dr. Millare signed the forms. These boxes were labeled "no. head in lot," "no. dead on arrival," "no. head [condemned on antemortem inspection]," and "total weight [condemned on antemortem inspection]." Dr. Millare explained that Mao Foods employees obtained the information to fill in those boxes after Dr. Millare signed. The

---

[17] Some of the boxes in the PCC's contained asterisks. The USDA inspectors filled out the remainder, the nonasterisked boxes, which included the boxes for input of the number of chickens condemned after postmortem inspection, discussed above, and boxes labeled "date inspected," "plant no.," "class of poultry" and "lot no(s)."

[18] Dr. Millare's signature appears on the majority of the version of the PCC's given Jazayeri by Susan Mao. Signatures were redacted on the copies of the PCC's produced in response to Jazayeri's FOIA request.

plant manager signed the forms to certify the accuracy of the information in those boxes. After those boxes were completed and the plant manager signed, a Mao Foods employee—generally Alland Zapata, head of quality control— gave a carbon copy of each PCC to Dr. Millare.[19] Dr. Millare input the information from the PCC's, including the numbers gathered by Mao Foods employees, into a computer for USDA's records. Dr. Millare kept the USDA's carbon copy of the PCC's for at least one year in a locked cabinet in his office at the plant. The original and the other two carbon copies of the PCC's were retained by the plant.

Dr. Millare further testified that when an FOIA request was received by the USDA for documents in his possession, he would be instructed to send the requested documents to the FOIA office of the USDA in Washington, D.C. Copies of the documents, with a number assigned—in this case 04-375— would be faxed back to Dr. Millare for his records. Dr. Millare brought to court copies of the documents faxed to him from Washington, D.C.

### D. Pitman's Testimony

David Pitman, who testified as an expert for the defense, was both a grower and an operator of a chicken processing plant. He corroborated Jazayeri's testimony with respect to the practices followed by the industry, confirming that the weight of the delivered chickens was determined by weighing the delivery trucks before and after the chickens were loaded; that the PCC's were used to determine the number of DOA and condemned chickens; that the weight of the dead or other unusable chickens was calculated based on the average weight of all the chickens delivered; and that it was customary to record the number of DOA chickens on the invoice from the grower. He also testified that when he delivered chickens to Mao Foods, sometime after the delivery, he received a check, a copy of the PCC and a calculation sheet similar to those offered into evidence by appellants, showing how the payment was calculated.[20]

### E. Zapata's Testimony

Alland Zapata testified that when he worked in quality control at Mao Foods, one of its employees—usually "Eliseo"—was assigned the task of counting the DOA chickens. The number was recorded on a blank piece of paper or on a purchase order. Sometimes the document containing the DOA number was signed; sometimes it was not. Using these documents, Zapata filled in the DOA box on the PCC's. When he was given the PCC's, the

---

[19] The PCC's were prepared in quadruplicate, using carbon paper.

[20] Pitman further testified that when he purchased chickens from R&A Ranch, he did not deduct for trim.

boxes stating the numbers of condemned chickens had already been filled in by the USDA inspectors. Zapata input the DOA numbers and other information from the PCC's into a computer file for Mao Foods's records. When he was finished, he gave the last carbon copy of the PCC's to one of the USDA inspectors. Zapata hand-delivered the remaining copies to Susan Mao, along with any weight slips and purchase orders received from the grower.

### F. *Motion for Nonsuit and Supplemental Testimony*

At the end of their case in chief, appellants offered all their exhibits into evidence. Respondents objected to the admission of the records reflecting the transactions between R&A Ranch and Mao Foods as hearsay and moved for nonsuit, based on the inadmissibility of appellants' critical exhibits.[21] Respondents' counsel argued appellants had not fulfilled the requirements of section 1271 for the admission of business records because some of the documents were prepared by persons other than those who testified. The court expressed surprise that appellants had not called anyone from Mao Foods to identify documents and suggested that appellants' counsel reopen to "do a proper job."

### 1. *Dennis Mao's Testimony*

Appellants called Dennis Mao, the president and general manager of Mao Foods. Counsel showed him one of the calculation sheets offered as an exhibit. He testified that it appeared to have been prepared by his mother, Susan Mao, and to contain her handwriting. He said he did not know specifically where each number on the calculation sheet came from, but knew generally that his mother received information from others at the plant, from the PCC's and from the weight slips.

Appellants' counsel referred the witness to copies of calculation sheets in respondents' exhibit books and asked whether he had seen those documents before or knew where respondents' counsel obtained them. The court interrupted the questioning to ask whether appellants had demanded production of documents at trial pursuant to Code of Civil Procedure section 1987. Counsel responded in the negative, explaining that documents had been exchanged during discovery. Counsel for respondents confirmed that documents had

---

[21] Respondents subsequently filed written objections to all of the approximately 150 exhibits containing the calculation sheets, the PCC's, the weight slips and the purchase orders or similar documentation. Respondents also objected to a number of the remaining exhibits, including copies of checks from Mao Foods to R&A Ranch, invoices for purchase of chicks by R&A Ranch and documents which represented attempts at a final accounting of the parties' dealings. The latter exhibits were not, however, the subject of discussion in court. The basis for respondents' objections was, in every case, hearsay.

been produced by Mao Foods during discovery, but contended that the Mao Foods documents in appellants' exhibit book were different from those exchanged. The court asked whether Susan Mao had been subpoenaed or noticed to appear at trial; she had not.

## 2. *Susan Mao's Deposition Testimony*

Appellants' counsel then read portions of Susan Mao's deposition into the record. In her deposition, Susan Mao testified that she was the Mao Foods employee responsible for preparing calculation sheets and that the calculation sheets were prepared in order to determine how much was owed for the chickens delivered by the growers.[22] She said she generally used the "invoices" and weight slips provided by the growers and the PCC's to prepare the calculation sheets. She stated that DOA chickens were counted by an employee of Mao Foods at the time of delivery.

## 3. *Court's Final Rulings*

After this evidence was introduced, respondents renewed their hearsay objections to the majority of appellants' exhibits. The court sustained all of the objections, stating, "There is a total failure properly to authenticate and/or otherwise introduce these documents. . . . The objections as to each and every one on the ground of hearsay are sustained." The court expressed particular criticism of the attempt to introduce the FOIA documents: "[Counsel], there are ways to get true copies of government documents. Having some witness say that 04-375 represents a document that's on file at the [USDA] isn't the way. It's a total failure of documentary support." The court noted that appellants "could have subpoenaed someone from FOIA . . . or the USDA." The court expressed agreement with respondents' counsel that Dr. Millare "was not competent to give the testimony that . . . he gave" because "[h]e was not the custodian of the records" and did not "represent the custodian of the records."

Respondents renewed their motion for "nonsuit."[23] The court granted the motion. Appellants filed a motion to vacate on the ground the documents had

---

[22] When asked about the PCC's given to Jazayeri, Susan Mao cited her Fifth Amendment right to refuse to answer incriminating questions.

[23] As the parties discuss in their briefs, nonsuit is appropriate only after a jury trial. (See Code Civ. Proc., § 581c, subd. (a).) Because in this case, the matter was tried to the court, we deem the motion made under Code of Civil Procedure section 631.8. (See *Roth v. Parker* (1997) 57 Cal.App.4th 542, 549 [67 Cal.Rptr.2d 250] [" ' "The purpose of Code of Civil Procedure section 631.8 is to enable a trial court which, after weighing the evidence at the close of the plaintiff's case, is persuaded that the plaintiff has failed to sustain his burden of proof, to dispense with the need for the defendant to produce evidence. [Citations.]" [Citation.] Thus, section 631.8 serves the same purpose as does section 581c, which permits the court to grant a nonsuit in a jury trial. [Citation.]' "].)

been adequately authenticated and that appellants had otherwise established the admissibility of the exhibits offered. Appellants contended that the court committed error in excluding the exhibits. The court denied the motion. This appeal followed.

## DISCUSSION

The exhibits which were the primary source of dispute at trial were those introduced to support appellants' first four categories of claims—all tending to show that respondents deliberately altered documents to induce appellants to believe that each delivery contained a greater number of DOA and/or condemned chickens than was actually the case, and arbitrarily reduced the weight of the chickens and price per pound when calculating the amount due R&A Ranch.[24] These exhibits consisted of multidocument packets containing some or all the following types of documents: (1) copies of the PCC's, including the version obtained from the USDA and the version obtained from Susan Mao; (2) weight slips obtained from a truck scale or truck weighing company, specifying the laden and unladen weight of the delivery trucks; (3) purchase orders prepared by R&A Ranch, listing the number of cages and chickens loaded onto the trucks for delivery, most with a notation at the bottom stating the number of DOA chickens; and (4) Susan Mao's calculation sheets showing computations of the amount due R&A Ranch for each delivery.

The proffered exhibits appear on their face to support appellants' claims. The exhibits show (1) discrepancies between the numbers of DOA and condemned chickens written on the PCC's prepared by the USDA inspectors and on the PCC's and calculation sheets given to Jazayeri by Susan Mao; (2) discrepancies between the number of DOA chickens counted and recorded at the time of delivery and the number of DOA chickens recorded on the calculation sheets; and (3) reductions in the overall weight of the chickens (calculated by subtracting the weight of the unladen delivery truck from the weight of the truck after the chickens were loaded and deducting DOA and condemned chickens) and price per pound before calculating the amount due R&A Ranch. There is no dispute that had these documents been admitted into evidence, granting respondents' motion for judgment would have been inappropriate.

■ Although the only ground for objection raised by respondents was "hearsay," in sustaining respondents' objections, the court noted "a total

---

[24] These are also the only exhibits discussed in the briefs on appeal. Accordingly, although it is not clear why the court sustained objections to documents supporting consequential damages, such as the amount appellants paid to purchase chickens they were unable to sell after respondents' termination, we do not address those exhibits.

failure properly to authenticate" the documents offered as exhibits. Accordingly, we address whether the documents were properly excluded from evidence by the trial court on hearsay or authentication grounds. We conclude (1) the altered PCC's obtained from Susan Mao were authenticated and were not hearsay as they were introduced not for the truth of the matter asserted, but as the operative documents establishing the fraud perpetrated on appellants; (2) the unaltered PCC's obtained from the USDA were properly authenticated and admissible as official records, with the exception of the DOA count, which was admissible as a business record; (3) the purchase orders, including the DOA numbers, were properly authenticated and admissible as business records; (4) the calculation sheets were admissible as admissions by a party opponent; and (5) the weight slips were admissible as adoptive admissions.

### A. Copies of Altered PCC's Obtained From Susan Mao

■ Documents not offered for the truth of the matter asserted are, by definition, not hearsay. Hearsay is defined in section 1200 as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." Where " 'the very fact in controversy is whether certain things were said or done and not . . . whether these things were true or false, . . . in these cases the words or acts are admissible not as hearsay[,] but as original evidence.' " (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 31, p. 714, quoting *People v. Henry* (1948) 86 Cal.App.2d 785, 789 [195 P.2d 478].) For example, documents containing operative facts, such as the words forming an agreement, are not hearsay. (*People v. Jimenez* (1995) 38 Cal.App.4th 795, 802 [45 Cal.Rptr.2d 466]; *People v. Dell* (1991) 232 Cal.App.3d 248, 261–262 [283 Cal.Rptr. 361].) The operative facts rule also applies in an action for fraud. (1 Witkin, *supra*, Hearsay, § 33, p. 715 ["In an action for . . . deceit, the words spoken, written, or printed may be proved"]; see *People v. Dell, supra*, 232 Cal.App.3d at p. 258 [words spoken by defendant to solicit prostitution are operative facts or " 'verbal acts' "].)

Appellants offered the altered PCC's given them by Susan Mao not for the truth of the matter asserted—that the inscribed number of chickens were DOA or condemned by the USDA inspectors—but as direct evidence of the fraudulent statements made to appellants by respondents. The evidence supported that respondents used the altered PCC's to induce appellants to believe that a greater number of chickens delivered by R&A Ranch to Mao Foods were DOA or condemned than was actually the case, and to accept payments of less than the amount due. "[T]his is a typical example of the nonhearsay use of an extrajudicial statement 'to prove, as relevant to a disputed fact in an action, that the . . . hearer . . . obtained certain information

by hearing . . . the statement and, believing such information to be true, acted in conformity with such belief.' [Citation.]" (*Holland v. Union Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, 947 [65 Cal.Rptr.3d 145], italics omitted, quoting 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Hearsay & Nonhearsay, § 1.4, p. 57.) Here, appellants accepted inadequate payment for the chickens sold to Mao Foods in reliance on the allegedly false representations of Susan Mao.

### B. *Copies of PCC's Obtained From the USDA*

#### 1. *Admissibility As Official Record Under Section 1280*

■ Section 1280 makes admissible a writing that records an act, condition, or event if "(a) The writing was made by and within the scope of duty of a public employee[;] [¶] (b) The writing was made at or near the time of the act, condition, or event[;] [and] [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." This exception to the hearsay rule is based on the presumption that public officers properly perform their official duties. As the court explained in *Fisk v. Department of Motor Vehicles* (1981) 127 Cal.App.3d 72 [179 Cal.Rptr. 379]: " 'When it is a part of the duty of a public officer to make a statement as to a fact coming within his official cognizance, the great probability is that he does his duty and makes a correct statement . . . . The fundamental circumstance is that an official duty exists to make an accurate statement, and that this special and weighty duty will usually suffice as a motive to incite the officer to its fulfillment . . . . It is the influence of the official duty, broadly considered, which is taken as the sufficient element of trustworthiness, justifying the acceptance of the hearsay statement.' [Citation.]" (*Id.* at pp. 78–79, italics omitted, quoting 5 Wigmore, Evidence (Chadbourn rev. ed. 1974) § 1632, p. 618.)

■ "The object of [the section 1280] hearsay exception 'is to eliminate the calling of each witness involved in preparation of the record and substitute the record of the transaction instead. [Citations.]' " (*Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 639 [39 Cal.Rptr.2d 384], quoting *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1451 [232 Cal.Rptr. 471].) "Accordingly, for the exception to apply, '[i]t is not necessary that the person making the entry have personal knowledge of the transaction. [Citations.]' " (*Gananian, supra*, 33 Cal.App.4th at pp. 639–640, quoting *Loper v. Morrison* (1944) 23 Cal.2d 600, 609 [145 P.2d 1].) "Assuming satisfaction of the exception's other requirements, '[t]he trustworthiness requirement . . . is established by a showing that the written report is based upon the observations of public employees who have a *duty* to observe the facts and report and

record them correctly.' " (*Gananian, supra,* 33 Cal.App.4th at p. 640, original italics, quoting *People v. Baeske* (1976) 58 Cal.App.3d 775, 780 [130 Cal.Rptr. 35].)

■ That PCC's fall within the official records exception to the hearsay rule is beyond dispute. Similar documents were at issue in *Imperial Cattle Co. v. Imperial Irrigation Dist.* (1985) 167 Cal.App.3d 263 [213 Cal.Rptr. 622], disapproved in part on other grounds in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432 [63 Cal.Rptr.2d 89, 935 P.2d 796] where the plaintiff introduced into evidence USDA cattle condemnation certificates to establish the number of its cattle that had contracted disease as the result of the defendant's negligence. On appeal, the court rejected the defendant's contention that the certificates were inadmissible hearsay: "The condemnation certificates appear to fall clearly within the 'official records' exception to the hearsay rule. . . . The record demonstrates that condemnation certificates are prepared by veterinarians employed by the federal government following an inspection of each cattle carcass if the veterinarian determines that the meat is infected with measles. Such evidence not only satisfies the first two predicates to the invocation of section 1280 but also indicates the basic trustworthiness of the documents." (*Imperial Cattle Co. v. Imperial Irrigation Dist., supra,* 167 Cal.App.3d at p. 272.)

Here, too, the record establishes that Dr. Millare and his staff prepared the PCC's after inspection of each chicken delivered. The inspectors gathered the information as the chickens were being processed, kept a total for each category on their tally sheets, and transferred the final numbers to the PCC's before the end of the day. Dr. Millare testified that he and the USDA inspectors he supervised prepared the forms in order to gather disease information on the chickens, and that the information from the PCC's is kept on computer files for USDA's records. The fact that one of the relevant numbers on the PCC's—the DOA number—was obtained and filled in by Mao Foods employees does not render the remainder of the information any less an official record.[25]

■ The court's basis for rejecting the PCC's Jazayeri offered into evidence as true and correct copies of USDA originals in order to establish the true number of DOA and condemned chickens is not entirely clear. The court appeared to agree with respondents' counsel that appellants had not proven the documents were official records because Dr. Millare, who testified as to the manner of their preparation, was not their custodian. However, Dr. Millare *was* the custodian of the PCC's generated at the Mao Foods plant. He testified

---

[25] To the extent the DOA number was not admissible under section 1280, it was nevertheless admissible under the business records exception of section 1271, discussed below. (See pt. C., *post.*)

that he kept all the USDA originals in a locked cabinet in his office. With respect to the particular PCC's involved here, Dr. Millare was directed to mail them to the USDA's Washington, D.C., FOIA office so that a response to appellants' FOIA request could be prepared. The FOIA office faxed back to him copies of the documents he had provided. Moreover, unlike the business records exception, the official records exception does not require "the custodian or other qualified witness" to testify in order to establish admissibility as an official record. (Compare § 1280 with § 1271.)[26] Dr. Millare's testimony established his personal knowledge that the PCC's were made "by and within the scope of duty of a public employee [¶] . . . [¶] at or near the time of the act, condition, or event," and that the "sources of information and method and time of preparation were such as to indicate [their] trustworthiness." (§ 1280, subds. (a), (b), (c).) That is all that section 1280 requires.

The general rule with respect to documents offered under an exception to the hearsay rule is that the party offering the documents bears the burden of establishing the foundational requirement of trustworthiness. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011 [81 Cal.Rptr.3d 299, 189 P.3d 300].) The trial court has "broad discretion in determining whether a sufficient foundation has been laid" and "we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion." (*Ibid.*) Here, it does not appear that the trial court concluded the foundational requirements of section 1280 had not been met; it appears rather that the court misunderstood what those foundational requirements were. Accordingly, we review the ruling excluding the PCC's de novo. Under that standard, the court's ruling was error.

---

[26] This distinction was discussed by the Supreme Court in *People v. Martinez* (2000) 22 Cal.4th 106 [91 Cal.Rptr.2d 687, 990 P.2d 563]. There, the prosecution sought to introduce noncertified CLETS printouts (computer records of the defendant's past convictions) through the testimony of a paralegal in the district attorney's office who, though not the custodian of the records, was familiar with the manner in which they were kept and retrieved. Concluding that the documents were properly admitted, the Supreme Court stated: "The third requirement of the official records exception is that '[t]he sources of information and method and time of preparation were such as to indicate [the record's] trustworthiness.' (Evid. Code, § 1280, subd. (c).) According to the Law Revision Commission's comment to Evidence Code section 1280, unlike the business records exception, which 'requires a witness to testify as to the identity of the record and its mode of preparation in every instance,' Evidence Code section 1280 'permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness.' (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1280, p. 347.)" (*People v. Martinez, supra*, 22 Cal.4th at pp. 128–129.)

## 2. *Authentication Under Section 1400 et seq.*

Respondents' brief indicates the real dispute was not over whether PCC's in general are admissible under the official records exception to the hearsay rule (§ 1280), but over whether the particular copies included in appellants' exhibits were properly authenticated under section 1400 et seq.[27] Respondents' brief contends that Dr. Millare admitted on cross-examination "he could not testify that what he had brought were true and correct copies of the official USDA records" because the documents faxed back to him "bore additional notations," including "the number 04-375, entered by someone in the FOIA office."

 Preliminarily, we note that respondents did not raise failure to authenticate as a ground for excluding appellants' exhibits. We need not dwell on this point, however, because the. documents were authenticated in multiple ways. First, Jazayeri testified that the unaltered PCC's she included in the exhibits were received in response to her FOIA request to the USDA. "If a letter or telegram is sent to a person and a reply is received in due course purporting to come from that person, this is sufficient evidence of genuineness." (2 Witkin, Cal. Evidence, *supra*, Documentary Evidence, § 17, p. 146, citing Evid. Code, § 1420.) This rule was applied in *People v. Roland* (1969) 270 Cal.App.2d 639 [76 Cal.Rptr. 72], where the court held that a teletype from the Department of Motor Vehicles' Sacramento office contradicting the defendant's claim to have applied for a duplicate license had been properly authenticated because the investigator who laid the foundation "telephoned the Sacramento office where duplicate license application records are kept and requested the information contained in the teletype" and received "the teletype . . . addressed to him . . . in answer to his request." (270 Cal.App.2d at p. 646; see also *Wolf Lake Terminals, Inc. v. Mutual Marine Ins. Co.* (N.D.Ind. 2005) 433 F.Supp.2d 933, 944 [official U.S. government documents obtained through FOIA request and authenticated by party who received them admissible under Fed. Rules Evid.]; *Williams v. Long* (D.Md. 2008) 585 F.Supp.2d 679, 690 [official publication obtained through subpoena or FOIA request "self-authenticating"].) Jazayeri's testimony that the USDA PCC's submitted as exhibits and offered for the truth of the matters stated were received from the USDA FOIA office in response to her request was sufficient to authenticate them. Second, Dr. Millare testified that he sent the original PCC's to Washington, D.C., after appellants submitted the FOIA request and received back a copy of the documents. He brought

---

[27] Section 1400 provides: "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." Section 1401 provides: "(a) Authentication of a writing is required before it may be received in evidence. [¶] (b) Authentication of a writing is required before secondary evidence of its content may be received in evidence."

those documents to court, so any genuine doubts about the authenticity of the copies included in appellants' exhibits could have been easily resolved. Finally, a comparison of the documents identified by Jazayeri as the USDA PCC's provided in response to the FOIA request with the copies of the PCC's given to Jazayeri by Susan Mao reveals that except for the numbers in the DOA and condemned boxes, the documents are identical and have every appearance of being copies of each other. (See *People v. Gibson* (2001) 90 Cal.App.4th 371, 383 [108 Cal.Rptr.2d 809] [documents may be authenticated by circumstantial evidence].)

Although writings must be authenticated before they are received into evidence or before secondary evidence of their contents may be received (§ 1401), a document is authenticated when sufficient evidence has been produced to sustain a finding that the document is what it purports to be (§ 1400). As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. (See *People v. Martinez, supra,* 22 Cal.4th at p. 128, fn. 7 ["[A]n objection that a [computerized] record is 'incomplete' generally 'go[es] to the weight of th[e] evidence and not its admissibility.' "]; *McAllister v. George* (1977) 73 Cal.App.3d 258, 263 [140 Cal.Rptr. 702] [where invoice for dental services was authenticated by its contents, "contrary inferences flowing from the facts that the bill was handwritten, not on official stationery, and signed by a student were issues going to the weight of the evidence . . ."].) As the PCC's provided in response to Jazayeri's FOIA request were properly authenticated, excluding them under section 1401 would have been improper even had respondents raised an objection on this ground.

## C. *Admissibility of DOA Documentation Under Section 1271*

### 1. *Purchase Orders and Other Delivery Documents*[28]

Section 1271 permits admission of business records to establish the truth of the matters contained therein if: "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources

---

[28] Respondents state that appellants "argue only that the USDA PCC's were wrongly excluded by the trial court" and contend that they "intentionally waived challenging the trial court's exclusion of [other] documents." It is true that the legal analysis section of appellants' brief, drafted when they were in propria persona, focuses on the USDA PCC's. However, appellants contend that "[t]he trial court erred in excluding *all* of appellants' documentary evidence that USDA forms had been altered in order to defraud" and support this contention with the discussion of the relevant facts. (Italics added.)

of information and method and time of preparation were such as to indicate its trustworthiness." Appellants established that the purchase orders offered into evidence were prepared by Rashidian in the regular course of business with respect to the date of delivery and number of chickens delivered. However, as R&A Ranch was not paid by the head, this information was only tangentially related to appellants' claims. The key piece of information contained on the purchase orders was the DOA number. Jazayeri testified that the DOA count was obtained on the date of delivery after the chickens were unloaded by a Mao Foods employee and generally written on the purchase order.

■ Respondents contend Jazayeri's testimony was inadequate to establish section 1271's foundational requirements with respect to the DOA count written on the purchase orders or the other similar documents containing that information because "[s]he did not witness more than a few of the transactions and could not identify the authors of numerous invoices in the collection" and because the procedures she described were "not consistently followed, by her own admission." The key to establishing the admissibility of a document made in the regular course of business is proof that the person who wrote the information or provided it had knowledge of the facts from personal observation. (1 Witkin, Cal. Evidence, *supra*, Hearsay, § 237, p. 954; *People v. Hovarter, supra*, 44 Cal.4th at p. 1012, quoting 2 McCormick on Evidence (6th ed. 2006) § 290, p. 314 ["So long as 'the person who originally feeds the information into the process [has] firsthand knowledge,' the evidence can . . . qualify as a business record."]; *People v. Fowzer* (1954) 127 Cal.App.2d 742, 747 [274 P.2d 471], quoting *Loper v. Morrison, supra*, 23 Cal.2d at p. 609 [" 'It is not necessary that the person making the entry [on a business record] have personal knowledge of the transaction. . . .' "].) Nor need the individual with personal knowledge testify; the rule permits any " 'qualified witness' " to establish to the conditions of admissibility. (1 Witkin, Cal. Evidence, *supra*, Hearsay, § 242, p. 960; see *People v. Fowzer, supra*, 127 Cal.App.2d at p. 747, quoting *Loper v. Morrison, supra*, 23 Cal.2d at pp. 608–609 ["It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event."].) The witness need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed, which Jazayeri clearly was.

Moreover, respondents overlook that several Mao Foods employees also testified concerning the manner of preparing the DOA count. Alland Zapata, head of quality control, testified that when chickens were delivered, one of Mao Foods's employees counted the DOA chickens and recorded the total on the purchase order or other handy piece of paper; Zapata then used that

document to fill in the DOA box on the PCC's. Susan Mao testified at her deposition that DOA chickens were counted by an employee of Mao Foods at the time of delivery. Pitman, the defense expert, confirmed that the procedures for counting and recording the number of DOA chickens described by Jazayeri were followed generally in the industry.

■ With respect to the contention that the records were not consistently kept, the record does reveal that the DOA counts were not uniformly written on the R&A Ranch purchase orders, but were sometimes written on other delivery documents or on blank pieces of paper and, contrary to Jazayeri's understanding, often were not signed. However, "that a business record contains some omissions does not necessarily render unreliable the information the record includes." (*People v. Hovarter, supra*, 44 Cal.4th at p. 1011.) In *Hovarter*, the trial court had admitted into evidence log sheets containing the names of truck drivers who had entered and departed a pulp mill and the dates and times of their entries and exits in order to establish that the defendant, a truck driver, was in the area at the time of the commission of the charged crimes. The defendant argued the log sheets were untrustworthy because they omitted the names of some truckers who had entered and departed the pulp mill and because the names of truck drivers and their times of entry into and departure from the mill were not placed uniformly in the same columns or locations on the log sheets. The court concluded that these showings, although indicating a "relative lack of orderliness," did not establish that the information contained on the log sheets was unreliable. (*People v. Hovarter, supra*, 44 Cal.4th at p. 1012.) Similarly here, the fact that the employee responsible for recording the DOA count did not perform the task in precisely the same manner every time and may have failed to do it at all in some instances, does not render the DOA counts contained on the purchase orders or other delivery documents inadmissible.[29]

### 2. *PCC DOA Count*

As discussed above, the DOA count appearing on the PCC's was entered by Alland Zapata, a Mao Foods employee, not a USDA inspector, and the accuracy of these entries was certified not by Dr. Millare's signature, but by the signature of the plant manager. This may preclude the admissibility of that information through the official records exception of section 1280. But as the information was obtained through a count performed in the regular course

---

[29] Respondents contend that the purchase orders must be considered unreliable because it cannot be determined whether purchase orders bearing "no DOA notation and no signature" should be considered "departures from procedure" or "affirmative evidence that the DOA's on those days were zero." Whether this argument might support the exclusion of a particular document or affect the weight given it by the fact finder, it did not justify the court's blanket exclusion of the purchase orders.

of business by a Mao Foods employee and transmitted to Zapata, who was responsible for inputting that information onto the PCC, the DOA information on the PCC's qualifies as a business record under section 1271.

■■■ With respect to the PCC's and the other documentary information offered to establish the true DOA counts, the court, in excluding the evidence, focused on the failure to call a Mao Foods employee to describe the procedures followed in collecting the data. However, any "qualified witness" who is knowledgeable about the documents may lay the foundation for introduction of business records—the witness need not be the custodian or the person who created the record. (*People v. Hovarter, supra,* 44 Cal.4th at p. 1012.) Although the trial court is accorded discretion in determining whether evidence sufficient to support the trustworthiness of a business record has been introduced, the court cannot ignore favorable evidence merely because the offering party did not follow the standard or preferred method of laying the foundation for admission. When combined with corroborating testimony from the Mao Foods witnesses, Jazayeri's testimony was sufficient to support the trustworthiness of the purchase orders and other documents showing the DOA counts. That none of the witnesses had observed all the DOA counts and that none could identify every employee who participated is of no consequence. "Many business records are prepared through the activities of several persons, and one employee may report facts he or she knows to a second employee, who then records those facts in the regular course of business. (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) § 4.9, p. 121.) So long as 'the person who originally feeds the information into the process [has] firsthand knowledge,' the evidence can still qualify as a business record." (*People v. Hovarter, supra,* 44 Cal.4th at p. 1012, quoting 2 McCormick on Evidence, *supra,* § 290, p. 314.) Here, the means by which the DOA numbers were routinely recorded on the PCC's was sufficiently established by witnesses with firsthand knowledge of the process to qualify the evidence for admission under section 1271.

## D. *Admissibility of Calculation Sheets Under Section 1220*

The exhibits disallowed by the court included Susan Mao's calculation sheets showing the computation of the amount due R&A Ranch for each delivery based on the net weight of the chickens (after deduction of the DOA and condemned birds) and the specified price per pound. The basis for the exclusion of the calculation sheets appears to have been the court's belief that they were admissible only as business records and that their admission required the testimony of a qualified person concerning their manner of preparation, which appellants—not having subpoenaed or noticed Susan Mao—failed to supply.

Where invoices or accountings received from third parties are offered into evidence as proof of the transactions described, hearsay issues arise which may be resolved only by the testimony of a qualified witness. (See, e.g., *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 43, fn. 10 [69 Cal.Rptr. 561, 442 P.2d 641] [invoices submitted to plaintiff by third parties not admissible to show that repairs described therein had been made where not " 'supported by the testimony of a witness qualified to testify as to its identity and the mode of its preparation' "].) The calculation sheets were not, however, prepared by third parties. They were prepared by Susan Mao and provided to appellants as an accurate calculation of the amounts due based on the weight of the live healthy chickens delivered.

■ Documents prepared by the opposing party are not subject to exclusion under the hearsay rule, because they are admissions.[30] "Admissions of a party . . . are received to prove the truth of the assertions; i.e., they constitute affirmative or substantive evidence that the jury or court may believe as against other evidence, including the party's own contrary testimony on the stand." (1 Witkin, Cal. Evidence, *supra*, Hearsay, § 91, p. 794.) "Express admissions may be oral or written. . . . Written admissions are found in many types of informal and formal documents, and the fact that a writing is made pursuant to statute, e.g., an income tax return, does not preclude its use." (*Id.*, § 92, p. 795; see, e.g., *Horton v. Remillard Brick Co.* (1915) 170 Cal. 384, 400 [149 P. 813] [defendant's financial documents, including profit and loss sheet and assets and liability account]; *Streetscenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 244 [126 Cal.Rptr.2d 754] [unaudited balance sheets presented to court and opposing party by counsel]; *Shenson v. Shenson* (1954) 124 Cal.App.2d 747, 752 [270 P.2d 896] [defendant's income tax returns]; *Sill Properties, Inc. v. CMAG, Inc.* (1963) 219 Cal.App.2d 42, 54–55 [33 Cal.Rptr. 155] [minutes of meeting of defendant's board of directors stating value of assets]; *Keith v. Electrical Engineering Co.* (1902) 136 Cal. 178, 181 [68 P. 598] [paper containing a statement of sales made by defendant and the dates of such sales "handed to plaintiff by defendant"].)

Several witnesses, including Dennis and Susan Mao, established that Susan Mao was responsible for preparing the calculation sheets. The purpose of the sheets was to support and document the amount Mao Foods paid R&A Ranch for each delivery. The calculation sheets were authenticated by Jazayeri, who received them directly from Susan Mao.

---

[30] Section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

### E. *Admissibility of Weight Slips Under Section 1221*

 Under section 1221, "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." The theory of adoptive admissions expressed in section 1221 " 'is that the hearsay declaration is in effect repeated by the party; his conduct is intended by him to express the same proposition as that stated by the declarant.' " (1 Witkin, Cal. Evidence, *supra*, Hearsay, § 102, p. 805, quoting Model Code Evid., rule 507, com. b.)

The weight slips showing the laden and unladen weights of the delivery trucks were prepared by third parties and were not admissible as business records, as no one with more than cursory knowledge concerning their mode of preparation testified. However, Jazayeri testified that she gave these weight slips to either Susan Mao or someone else employed by Mao Foods. The information they contained concerning the weight of the load was used by Susan Mao to compute the weight of the chickens delivered, and the amount Mao Foods paid R&A Ranch for each delivery was derived from calculations incorporating this information. Accordingly, these documents were admissible as adoptive admissions. (See *Kelly-Springfield Tire Co. v. Sischo* (1933) 136 Cal.App. 38, 42–43 [28 P.2d 50] [freight bills prepared by third party and defendant's months-long silence after receipt of statement of account from plaintiff could be considered by trier of fact in determining whether defendant received shipments of goods]; *People v. Hayes* (1999) 21 Cal.4th 1211, 1257 [91 Cal.Rptr.2d 211, 989 P.2d 645] ["The hearsay rule does not bar evidence offered against a party who has admitted the *truth* of the hearsay statement."].)

To the extent respondents seek to contest the authenticity of the copies of the weight slips offered into evidence, section 1414 provides that "[a] writing may be authenticated by evidence that: [¶] (a) [t]he party against whom it is offered has at any time admitted its authenticity; or [¶] (b) [t]he writing has been acted upon as authentic by the party against whom it is offered." Jazayeri testified that the documents contained in appellants' exhibits were copies of the weight slips given to Mao Foods, and that the calculation sheets Susan Mao presented to Jazayeri incorporated the weight information. This was sufficient to authenticate the documents. (See *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1527 [53 Cal.Rptr.3d 700] [plaintiffs admitted authenticity of deposition transcripts relied on by defendant seeking summary judgment by using portions of transcript in their separate motion for summary judgment].)

## DISPOSITION

The judgment is reversed. The matter is remanded for retrial. Appellants shall recover their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 19, 2009, S174406.