Filed 2/18/21  Rael v. Sybron Dental Specialties CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| CODIE RAEL, | B292599 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC584994) |
| v. | |
| SYBRON DENTAL SPECIALTIES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge.  Reversed and remanded.

Seyfarth Shaw, Jon D. Meer, Jamie C. Pollaci; Munger, Tolles & Olson, John W. Spiegel, Fred A. Rowley, Jr., Jeffrey Y. Wu and Mattehw K. Donohue for Defendants and Appellants

Sybron Dental Specialties, Inc., KaVo Kerr Group, Kerr Corporation, Ormco Corporation and Danaher Corporation.

Shegerian & Associates, Carney R. Shegerian and Jill P. McDonell for Plaintiff and Respondent.

_____

A jury found Sybron Dental Specialties, Inc., KaVo Kerr Group, Kerr Corporation, Ormco Corporation and Danaher Corporation liable for age-based harassment and discrimination and awarded their former employee Codie Rael $5,282 in economic damages, slightly more than $3 million in noneconomic damages and punitive damages of $28 million ($16 million against Sybron Dental and $12 million against KaVo Kerr). On appeal defendants contend the court erred in denying their motion for a new trial based on procedural irregularity (the court had provided the jury with an annotated special verdict form with the court's notes filling in the amounts of damages to be awarded to Rael) and juror misconduct (a vote-trading proposal). In addition, they argue the court committed prejudicial error in precluding evidence that responded to Rael's claim of a companywide effort to force out older workers and imposed an improper discovery sanction that unfairly restricted their defense in the bifurcated punitive damages phase of trial. They also assert the awards of noneconomic/emotional distress damages and punitive damages are excessive. Because we agree the court committed prejudicial error in excluding defense evidence during the liability phase, we reverse without reaching the other issues raised by defendants.

# FACTUAL AND PROCEDURAL BACKGROUND

1. *Rael's Employment with Defendants*

Sybron Dental, KaVo Kerr, Kerr Corporation and Ormco, sometimes referred to by the parties as the "dental platform" or the "dental platform companies," manufacture and sell dental equipment and products. During the relevant period they were all subsidiaries of Danaher Corporation, a publicly traded, diversified company with worldwide operations.[1]

Rael was employed in various capacities at a number of the dental platform companies starting in November 1978 (when she was 18 years old) continuing through October 2014 (when she was 54 years old). Her final position was Materials Buyer/Planner III with SybronEndo, a division of Ormco, where she worked with dental products from their creation through shipment.

On October 23, 2014 Rael gave four-weeks' notice she was resigning, explaining she had been suffering for months from undue stress at work. The following day Jimena Pena, a human resources manager, made Rael's resignation effective immediately. Defendants do not dispute on appeal that each of them is properly considered Rael's employer, either directly or indirectly, or that Rael was terminated or constructively discharged from her employment in October 2014.

---

[1] Sybron Dental was a direct subsidiary of Danaher Corporation. Kerr Corporation and Ormco were subsidiaries of Sybron Dental. SybronEndo, the group in which Rael worked, was part of Ormco. KaVo Kerr, also a direct subsidiary of Danaher Corporation, was in essence only a marketing name and had no employees.

2. *The Expansive Complaint and More Limited Claims at Trial*

On June 12, 2015 Rael filed her complaint asserting 19 causes of action, including age, gender and disability discrimination, harassment and retaliation in violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), as well as failure to accommodate a disability, breach of contract and wrongful termination in violation of public policy. Rael alleged that harassing comments from her group's manager, Fernando Estavillo, and her increased workload were part of a discriminatory campaign to force her to resign.

At trial Rael's claims were limited to age- and gender-based discrimination and harassment, retaliation and wrongful discharge. The jury rejected the claims of gender-based discrimination and harassment.

3. *Rael's Evidence of Age Discrimination and Harassment*

Danaher Corporation acquired the dental platform in 2006. Beginning at that time, according to witnesses presented by Rael, including four who had worked in divisions in the dental platform companies other than SybronEndo,[2] employees heard comments from managers at meetings and elsewhere that they were too old, too slow and outdated, behind the times and resistant to change. This "me too" evidence indicated supervisors favored younger employees and demeaned older ones with a goal of forcing them to leave.[3]

---

[2] The court overruled defendants' objection to testimony from witnesses who had not worked in the SybronEndo group.

[3] In his opening statement Rael's counsel told the jury this evidence would show that Danaher Corporation "engaged for

4

Estavillo became Rael's supervisor in March 2014. When he assumed that position, he asked Rael how they could operate SybronEndo with two employees rather than three and told Rael a more senior official wanted her coworker Tod Kremer gone. Kremer, who was 53 years old at the time, testified he witnessed Estavillo disparage older employees. Feeling harassed himself, he resigned in July 2014. He was replaced by an employee who was 20 years younger and earned substantially less.

Rael's other coworker in the SybronEndo group, Vicky Ly, testified Estavillo made condescending comments about older employees, repeatedly stated, "We need younger workers," and acted toward her in a degrading and hostile manner. Ly was 42 years old at the time. She resigned in July 2014.

Prior to Estavillo becoming her supervisor, Rael had received only positive work performance reviews. However, Rael believed Estavillo was trying to force her to leave the company by increasing her workload and making her look bad. She testified he refused her necessary training and support and repeatedly referred to her as "old culture," "outdated" and resistant to change.

After complaining to other managers, Rael emailed human resources vice president Vicki Perry on August 21, 2014 asking for help. Perry emailed Estavillo's supervisor, Cathy Nebel, that

---

profit in systemic age discrimination" throughout its operations. In his closing argument during the liability phase, he stated Danaher Corporation had 71,000 employees and invited the jury to consider the impact "if they treated at minimum 10 percent of their workforce the way they treated the department that you know so well about."

she had been "hearing noise for a while about Fernando and his style and [Ly] indicated concerns about his style in her exit interview." Nebel contacted Estavillo about Rael's concerns.

On September 4, 2014 Pena met with Rael. Rael broke down crying during the meeting while telling Pena about Estavillo's age harassment, her unmanageable workload and her fear he was trying to push her out. Rael asked for a transfer to a different work situation. Pena told Rael that others had also complained about Estavillo, that the company wanted its managers to be successful, and that Estavillo was being "coached" to improve his management style. According to Rael, Estavillo, knowing she had reported him to human resources, made matters worse, yelling at her and repeating that she was outdated and old culture.

After Rael made an emotional complaint to a senior manager immediately before a client joined a conference call in late September 2014, she received a written warning for her unprofessional behavior. Rael told Pena she believed the warning was in retaliation for having complained to human resources about Estavillo. In late October 2014 Rael reported a missed shipment from her largest client and, as a result, was having difficulty reaching her on-time delivery (OTD) rate, which could lead to her termination. Estavillo refused to give her the help she needed to meet her goal. At this point Rael felt she had no choice but to resign before she was fired. Rael was replaced by a male employee who was in his thirties.

With Rael's departure, all three of the employees in the SybronEndo group when Estavillo became its manager, each of them over 40 years old, had left the dental platform companies.

Rael presented evidence the replacement employees were substantially younger and were paid significantly less.

4. *Defendants' Version of Events and the Court's Ruling Excluding Evidence*

The dental platform companies required employees to meet an OTD rate of 95 percent. Rael's rate in 2013 was 73 percent. When Estavillo became manager of Rael's group, he worked with its three employees to improve their below-target rates. By August 2014 Estavillo became concerned Rael was not cooperating in efforts to increase OTD rates. It was around this time that Rael contacted Perry to complain about Estavillo's management style. Rael described herself as "upset, insulted, overwhelmed and tired," but did not allege gender- or age-based harassment or discrimination. Following Rael's complaint Perry contacted Nebel and requested her active participation in ensuring Estavillo managed his team appropriately. By early September Pena had also contacted Estavillo about Rael's concerns. Some weeks thereafter Pena spoke to Rael about her workload. Rael provided the information on October 23, 2014, the same day she tendered her resignation.

Approximately six weeks after her resignation Rael accepted a job offer from Spectrum Brands, where she began working as a supply planner on January 1, 2015. Her new salary was higher than it had been in her old position with defendants.

To counter evidence from witnesses from the dental platform outside SybronEndo who had testified regarding harassing comments targeting older employees with a goal of forcing them to leave, defendants sought to introduce three exhibits that contained dental-platform-wide data about the age of hired and terminated employees at Sybron Dental,

Kerr Corporation and Ormco. According to defendants' proffer, the data showed the companies had hired a similar number of, or more, employees over age 40 as they had laid off.[4] Pena, who managed employee data for the human resources department and who testified she oversaw an analyst's preparation of the documents containing the data, was designated to offer the information. The trial court sustained Rael's objection for lack of foundation, explaining it needed to know who entered the data, how it was entered and how it was maintained, which would require testimony from the custodian of records. The court rejected defendants' argument Pena could provide the necessary information.

The court also expressed doubt as to the significance of the data, suggesting only evidence that terminated employees who were over 40 years old had been replaced by workers who were also over 40 would be relevant. The court subsequently ruled defendants could only present data concerning the SybronEndo group.[5]

5. *Rael's Reaction to Her Work Conditions and Termination*

In September 2014 Rael began seeing a clinical psychologist, Jennifer Reed, who diagnosed Rael with an adjustment disorder mixed with anxiety and depression. Rael testified that, prior to seeing Dr. Reed, she had been experiencing emotional exhaustion, daily headaches and body shakes, which

[4]     Exhibit 433 contained data for Kerr Corporation; exhibit 434 for Ormco; and exhibit 435 for Sybron Dental. As discussed, KaVo Kerr had no employees.

[5]     Rael's motion to strike portions of appellants' reply brief addressing this issue is denied.

Rael attributed to harassment at work from Estavillo and fear of losing her job. On October 10, 2014, two weeks before her termination, Rael visited her physician for physical and emotional exhaustion. When escorted from the workplace after Pena told Rael her resignation was effective immediately, Rael felt humiliated.

Rael reported anxiety, difficulty concentrating, difficulty breathing, headaches and various other symptoms when examined by workers' compensation doctor Norma Yacoub after her termination. Dr. Yacoub initially diagnosed Rael with a major depressive disorder but found her symptoms had significantly improved by December 2014. At her last visit with Dr. Yacoub in January 2015 after beginning her new job, Dr. Yacoub determined Rael was no longer suffering from anxiety or depression.

Dr. David Glaser, a forensic psychiatrist who first saw Rael in December 2016, testified on behalf of Rael that Dr. Yacoub's opinion that she had a major depressive disorder in November 2014 that had resolved itself by January 2015 "makes no sense to me. You don't suddenly in a two-month period without any intervention of significance go from a major depressive disorder to no diagnosis." Dr. Glaser diagnosed Rael with mild to moderate major depressive disorder persisting at least through April 2018, with symptoms. Dr. Glaser believed one to two years of therapy would be very helpful, but Rael chose not to seek treatment. Another plaintiff's expert, Heather Halpern, a social worker, had also suggested therapy.

Rael testified that, since her termination, "I'm just not the same me anymore." She described herself as feeling empty, alone, unwanted and frustrated and said she cries, neglects her

9

appearance, no longer hikes or goes to the gym and is exhausted from thinking about it.

6. *The Annotated Special Verdict Form*

Trial was bifurcated. Phase I addressed liability and compensatory damages; Phase II addressed punitive damages. Trial began on April 30, 2018. On Friday, June 15, 2018, after 24 days of trial, the jury retired mid-afternoon to deliberate on Phase I issues. It was provided a seven-page, 22-question special verdict form. Question 20 provided lines for the jury to insert figures for the several types of compensatory damages that could be awarded Rael.

Approximately 90 minutes after deliberations began, Rael's counsel notified the court the special verdict form included handwritten numbers next to each item of compensatory damages: $384,000 for past economic loss, $960,000 for future economic loss, $9,900,000 for past noneconomic loss, $4,850,000 for future noneconomic loss and $16,094,000 for total damages. The court responded, outside the presence of the jury, "That's my handwriting. Guilty. Jiminy Christmas. Stupid," and explained it had made notes on the verdict form during closing argument by Rael's counsel. That copy had inadvertently been duplicated for the jury.

The court indicated something needed to be said to the jury before it was excused for the weekend. Defendants' counsel agreed and urged the court to make a strong statement that did not indicate it had made the notes. The court, however, responded it wanted "to tell them the truth." It then explained to the jury, "[M]istake right out of the chute—and I'm terribly sorry, and it's the Court's fault—on the special verdict form. . . . [W]hile the argument was going on, the Court's copy, I was making—

10

writing down what the parties had proposed, and I had written down on mine, this turns out to be mine, in pencil, and I had written down on it what plaintiff said. . . . What's on it is exactly what the plaintiff had said in their argument, okay, which the fact that I wrote it down there does not mean that the Court in any way is taking a position as to whether that is right or wrong. . . . And then I wrote down the defendants' while he was arguing, but it had already been photocopied, and it didn't record with anybody. . . . So I just want you to know that it in no way is that any indication of what the Court thinks. Okay? . . . [W]hen you get back here on Monday morning, you'll all have a clean copy without any scribble-scrabble."

It was subsequently determined that at least some of the jurors had reviewed and commented on the numbers, while others said they had not seen them.

7. *The Jury's Deliberations and Phase I Verdict*

After lunch on Tuesday, June 19, 2018, the second full day of deliberations, the jury sent a note indicating they had "no majority" on two of the liability questions (questions 5 and 19). The jury was instructed to continue deliberating. On Thursday morning, June 21, 2018, the jury asked, "If the jury is deadlocked on a certain question, how do we proceed, meaning, if we can't get a majority?" The jury was again directed to continue deliberating.

The jury resumed its post-lunch deliberations on June 21, 2018 at 1:35 p.m. At 2:40 p.m. the jury announced it had a verdict. In a series of nine-to-three votes the jury found defendants liable on Rael's claims of age-based harassment and discrimination, but not gender-based harassment or discrimination. Juror Nos. 3, 4 and 12 did not vote in favor of

11

Rael on any of the liability questions. The jury found Sybron Dental had acted with malice, oppression or fraud (with 10 yes votes; Juror Nos. 4 and 12 did not agree), as did KaVo Kerr (with 9 yes votes; Juror Nos. 3, 4 and 12 did not agree). Kerr Corporation and Ormco were found not to have acted with malice, fraud or oppression. The jury awarded $5,282 for past economic loss; $0 for future economic loss; $2,084,511 for past noneconomic loss; and $1 million for future noneconomic loss.

When initially polled regarding question 19, although the vote was nine to three as with the other liability questions, Juror No. 3 stated she had voted to find Rael's discharge and/or constructive discharge had caused her harm; and Juror Nos. 4, 9 and 12 stated they had not voted in favor of Rael. After the clerk finished polling the jury regarding the remaining questions, defendants' counsel asked the court, "May we count 19 again? I think I have it wrong." When polled again, Juror No. 3, Lisa Franklin, now said she had not voted to find liability, while Juror No. 9 (Kenneth Perry, the presiding juror) said he had voted in favor of Rael on that question. None of the other votes differed between the first and second polling. No explanation for the change in Juror Nos. 3's and 9's answers was requested.

8. *Juror Notes Complaining of Possible Misconduct and the Court's Inquiry*

The Phase I verdict was returned toward the end of the court day on Thursday, June 21, 2018. Following its customary practice not to continue trial on Fridays, the jury was excused until the following Monday, June 25, 2018.

12

While meeting with counsel on Monday morning,[6] the court revealed it had received two juror notes concerning Phase I deliberations, which the court described without saying when they had been delivered. One, from Alternate Juror No. 4, Joseph Paolillo, was undated and simply stated, "I need to speak to the judge about possible jury misconduct." The second, dated June 21, 2018, from Juror No. 10, Maria Llanos, stated, "One member of the jury proposed that she would change her vote to 'yes' in question 19 if we vote no punitive damages. Then the foreman made the proposal to all members again. Is this legal?"

In response, the court conducted a limited inquiry, questioning under oath four of the individuals involved: Perry, the presiding juror; Llanos and Paolillo, the authors of the two notes; and Franklin, the juror who had allegedly made the initial proposal. Speaking to Perry first, the court read Llanos's note and asked, "Is that what the juror said?" After identifying Franklin as the juror who had spoken, Perry explained that, two or three days into deliberations, "We were deliberating. We were kind of deadlocked on a couple of issues. We kept going back to those. . . . [We were] trying to get to nine so we could present a verdict." He continued, "Ms. Franklin, she—she realized that, you know, okay, for us to get to nine—you know, after listening to everybody, her position changed, so that's how

_____

[6]     As discussed in the following section, due to a family emergency, Judge Bryant-Deason was not at court on Friday, June 22, 2018; and in her absence Judge Michael Stern issued orders regarding discovery of financial information for the punitive damages phase of the trial.

13

we were able to get to nine on that question.  And we also said that, well, if we—when we get to the punitive phase, this is what we need to look at.  Look at who do we believe were directly involved for causing the situation for Ms. Rael. . . .  So it wasn't that she was saying, well, if I do this, we got to—we have to—you guys have to work with me on this.  That wasn't the case. . . .  It wasn't a—you know, I don't recall her—I don't recall it being, you know, based on what—you sound like a bartering system."  When the court indicated that was what the note seemed to say, Perry pointed out that, contrary to the implication in the note, the jury had voted in favor of punitive damages.

Turning to the second portion of the note, which reported the presiding juror had repeated the same proposal, the court asked, "Is that where you're saying that you said, 'Let's keep deliberating and listen to each juror.'  Is that what you're saying?"  Perry replied, "Yeah we kept deliberating."  He added that the statement was not, "if I do this, then, we can't do this. . . .  It was more so, if I'm willing to switch based on what I've heard, but on this we need to still deliberate because we—we felt like only a few of them were directly [responsible], as opposed to all [for purposes of punitive damages]."  He continued, "It wasn't like—Well, if I'm going to do this favor for y'all, y'all need to do this for me."  The following exchange then took place:

> "The Court:  Uh-huh.  We call that a quid pro quo.
> "A Juror:  A quid pro quo.  Right
> "The Court:  So there was no—
> "A Juror:  No, there's no quid pro quo.
> "The Court:  Okay."

Llanos, who was interviewed next, confirmed that she had written the note and explained the jury was deadlocked at eight-

14

to-four on question 19 when one of the jurors said out loud, "I will change my vote to 'yes' in question number 19 if you guys vote 'no' in the question that was related to punitive damages." Llanos told her, "Don't say that. I don't think that's right." At that point, "People start talking, talking, talking, so my voice went into nothing. And then it was time to go to lunch." When they came back from lunch, "The foreman stated it again, that if some—that somebody willing to change their vote. And I told him, in front of everybody, don't do that. I don't think it's legal, I don't think it's moral. And then he says, 'It's a negotiation. It's a negotiation.'" Llanos, after telling the court she was trying to understand the difference between negotiating and deliberating, agreed with the court that no one had specifically promised to switch votes in exchange for not voting for punitive damages as to all five defendants.

The court then asked Franklin if the note accurately stated what she had proposed. Franklin responded, "Not necessarily. I did mention something similar to that," explaining, "Number 19 was a question that everybody had problems with."[7] Elaborating, Franklin said, "I'm not sure [Llanos] necessarily understood exactly what I was saying. I was asking them, let's revisit number 19, because number 19 has as much to do with 20 and 21 as anything else. That—that, based on the fact that I believe something happened, I could possibly, you know, vote 'yes' on number 19, but I definitely wasn't sure that I would vote, you know, 'yes' on number 20."

---

[7] Franklin added she was "still not sure" about the answer to question 19.

Paolillo, asked about his note, explained the misconduct he referred to was "trading votes." He elaborated, "The foreperson said that—during the break, one of the jurors suggested that she would change her vote on—I'm not certain of the question number. It was—vote on that question was eight, yes, to four, no. She would change her vote to 'yes' if five other jurors would change their votes on six other questions."[8] Paolillo did not hear Franklin make the proposal, only Perry repeating it after the jurors had returned from lunch. The reference to the six other questions, Paolillo explained, was to ones where there were not yet nine votes; and the presiding juror added, once the jurors did that, they could all go home because the judge would decide punitive damages.[9] One of the jurors said she would not participate in that process. Paolillo continued, "I expect[ed] other jurors to do that, but then nobody else did. I was pretty surprised. They just did it like that. They just changed their votes." The court asked, "Who are they?" He replied, "Five of the jurors on the six questions. It was originally eight to four—yes, and then they changed votes. So it was three to nine on all six, I believe." The court pressed Paolillo, "I'm hearing you, but are you suggesting that vote trading actually happened?" He

---

[8] Both questions 21 and 22 concerned liability for punitive damages. Ultimately the jury voted yes as to Sybron Dental and KaVo Kerr and no as to the other three defendants on both questions—thus, four questions answered yes and six answered no.

[9] Paolillo added that he knew the statement the judge would decide punitive damages was wrong, but did not say anything because alternates were not supposed to speak.

16

answered, "Definitely it happened, yeah. . . . I'm not sure who the original eight were that voted yes, but changed. Five of them changed their vote. It was a show of hands. . . . I did notice the total changed from eight to four to three to nine."

Defendants' counsel suggested the court also speak to Juror No. 12, Patricia Hanley, who had voted for the defendants, because, he said, Perry had an interest in protecting the verdict. The court declined, but stated it would pose a question to the jurors collectively after lunch concerning the issue. However, following the lunch recess the court stated it was not going to ask any further questions and ruled no juror misconduct had occurred.

9. *Financial Discovery, Orders and Sanctions*

Before trial Rael served a notice under Code of Civil Procedure section 1987, subdivision (c), requesting production at trial of all documents showing any aspect of each defendant's financial condition, "including balance sheets, accounts payable accounting ledgers, accounts receivable, accounting ledgers, receipts, invoices, state and federal tax returns, checking account statements, savings account statements, leases, titles to real and personal property, contracts, agreements, stocks, bonds, and other financial investments." Defendants timely objected. No motion to compel was filed.

During a pretrial conference on April 17, 2018 the court stated it would follow its normal procedure regarding financial information relating to a bifurcated trial regarding punitive damages: "Take your financials, and you have your P and L's, your spreadsheets . . . . You need everything for all of them. Put them in an envelope. Seal it. Bring it back on the 30th when we are going to start."

When defense counsel provided the envelope on April 30, 2018, the court asked, "That's it?" and commented, "I thought they were public companies." Counsel explained that only Danaher Corporation was a public company and the court had dismissed the punitive damage claim as to it. The other four defendants were all private companies. The court then stated, "That can't possibly be adequate information," and observed, "There has to at least be some sort of audit, whether you're public or not. There had to be those kinds of reports, and I expect them. I expect the P&L, balance sheet." Rael's counsel said he expected more than line-item information for each company. The court agreed and ordered production of the information it had described, as well as Danaher Corporation's latest form 10-K. On May 2, 2018 defense counsel provided an amended financial production in a new envelope, which now included (as subsequently disclosed) nearly 100 pages of the ledgers underlying the financial statements previously produced and Danaher Corporation's form 10-K.

On June 21, 2018, after receiving the Phase I special verdict, the court opened the sealed envelope, which contained Danaher Corporation's 10-K's and what defense counsel described as separate balance sheets for the operating companies. Rael's counsel asserted that more than balance sheets was needed for an accurate depiction of defendants' financial condition. He continued, "If this is essentially the same thing that was given to the Court last time but with the 10-K thrown in it to make it appear larger, then that is a serious issue." The court added, "That is exactly what it looks like."

Rael's counsel asked for full compliance with the financial information requested in its fourth amended notice to produce

18

documents, which it provided to the court. After initially responding, "Absolutely," the court directed Rael's counsel to give the information it now had to its expert, Dr. Tamorah Hunt, and then "see if there's anything else that is needed that has not been given, once she gets a chance to look at it, that's on this list [referring to the documents sought in the amended notice]." Rael's counsel pointed out what he believed were missing items; defense counsel began to explain where that information was in the material produced; and the court said it was not going to sort the matter out: "If this is the way it's going to be, then this is the way it's going to be, and let the chips fall where they may. So I can't—I can't make them redo it, and I'm not going to. Okay? But if there's anything else that you feel that you need, I want you to get in touch with them. If there's an issue, you'll just pop right down here tomorrow, and we'll get it right away. Okay?"

That evening, without any additional informal requests for financial information, Rael's counsel notified defense counsel they would file an ex parte application the following morning demanding immediate compliance with Rael's initial request. The declaration in support of the motion acknowledged that balance sheets and ledgers had been provided but described the production as "woefully deficient." Specifically, the motion sought information relating to defendants' real property, information demonstrating the money transferred from Sybron Dental to Danaher Corporation for the past three years, audited balance sheets, and financial documents from 2018. Defense counsel stated they would oppose the motion.

Judge Bryant-Deason was not at court on Friday, June 22, 2018 due to a family emergency. Judge Michael Stern heard Rael's ex parte motion. According to a declaration subsequently

19

filed by defense counsel, Judge Stern reviewed the ex parte papers in chambers, did not see defendants' opposition papers and would not hear from defense counsel. Judge Stern ordered full compliance with the original request by 2:00 p.m. the following day (Saturday). Defendants produced additional financial material regarding the first quarter of 2018.

On Monday, June 25, 2018 Rael filed an additional ex parte motion seeking evidentiary sanctions for defendants' failure to produce all financial information responsive to their request, as twice ordered by Judge Bryant-Deason and again ordered by Judge Stern. Defendants moved for relief from Judge Stern's order. The court denied defendants' motion, finding Judge Stern's order was a valid ruling. The court then found defendants had violated the court's rulings[10] and stated, "The court will not impose any sanctions other than—after I have heard the plaintiff's case, I will decide whether or not you may put on a defense witness. I don't know if you will or not."

10. *The Punitive Damage Trial and Award*

Explaining that defendants had not produced many of the financial documents she needed, Dr. Hunt testified that, based on what she was able to review, the value of the equity and

_____

[10]    The court found inadequate the first quarter 2018 information provided following Judge Stern's order, as well as the earlier produced balance sheets for the operating companies, because there were no signed auditor sheets, stating, "A third-party independent audit is what you should have." Counsel tried unsuccessfully to explain, as it had previously, that the balance sheets were internally audited and argued it was not reasonable for Judge Stern to order on Friday morning that a third-party audit be conducted by the next day.

book value for KaVo Kerr was $767 million. She also testified that Danaher Corporation had paid more than $2 billion to acquire Sybron Dental in 2006 and that she lacked the documentation necessary to determine how the value of Sybron Dental had changed between 2006 and 2018. Finally, Dr. Hunt testified Danaher Corporation, the parent of Sybron Dental and KaVo Kerr, represented to the public in 2017 that the revenue generated by its dental segment was $2.8 billion, with KaVo Kerr generating $1.7 billion of that total.

During Dr. Hunt's cross-examination the court sustained multiple objections to questions about her interpretation of defendants' financial information because of defendants' violation of the court's discovery orders. (Indeed, the court indicated it was inclined not to allow any cross-examination of Dr. Hunt.) In addition, the court ruled defendants could not call any witnesses or present any evidence in Phase II.

In his closing argument Rael's counsel asked the jury to assess punitive damages of $60 million against Sybron Dental, 3 percent of Sybron Dental's $2 billion net worth, and $13,553,670 against KaVo Kerr, 2 percent of that company's $767 million net worth. The jury awarded $16 million against Sybron Dental and $12 million against KaVo Kerr.

Judgment was entered on July 13, 2018.

11. *Postjudgment Motions*

Defendants moved for a new trial based on procedural irregularity, juror misconduct and excessive damages and for a partial judgment notwithstanding the verdict on the ground that the punitive damages award violated due process. In her juror declaration in support of the new trial motion, Hanley essentially bridged the gap between Llanos's and Paolillo's accounts of

21

Franklin's vote-trading suggestion, on the one hand, and Perry's and Franklin's description of it, on the other hand, indicating Franklin had said, if jurors voted no as to whether some of the defendants would have to pay punitive damages, she might change her vote on question 19.[11]  With her opposition papers Rael submitted declarations from five other jurors (Perry and Juror Nos. 1, 6, 7 and 11) who averred no vote trading had occurred.[12]

---

[11]    According to Hanley, "On the third day of deliberations, we were still deadlocked on special verdict question number 19.  Lisa Franklin, a fellow juror, had voted 'no' on all the prior questions, but said, 'I'll say "yes" on this' and referred to question number 19, which asked, 'did the discharge and/or constructive discharge cause Codie Rael harm?'  Lisa then wanted to discuss the questions where we were asked to identify which defendants would have to pay punitive damages.  Lisa proposed, 'if you vote "no" on some of these, I might change how I vote.'  Lisa was referring to changing her vote to 'yes' for question number 19 if the jury would pick only two, and not all five, of the defendants to be liable for punitive damages.  [¶]  . . . After this proposal for vote trading was made, the jury voted 9-3 on question number 19.  We broke the deadlock because in the jury room Lisa Franklin changed her vote from 'no' to 'yes' on question number 19.  The jury then voted to award punitive damages only against defendants Sybron Dental Specialties, Inc. and KaVo Kerr Group."

[12]    The declarations of Juror Nos. 1, 6, 7 and 11 each stated, in identical language, "Based on my observations, none of the jurors engaged in vote trading."  Juror Nos. 1 and 7, but not Juror Nos. 6 and 11, also specifically declared they never saw or heard juror Franklin or any other juror discuss vote trading.  Perry, who had been questioned by the court on June 25, 2018, declared,

22

The court denied both of defendants' motions. With respect to the annotated jury form, the court ruled it had cured any prejudice by removing the form and instructing the jury the notes did not reflect the court's thinking.

As to juror misconduct, the court ruled defendants had not waived the right to assert this ground for a new trial by failing to immediately move for a mistrial on June 25, 2018 when the issue first surfaced and overruled Rael's objections to Hanley's declaration, finding any question of her credibility went to weight, not admissibility. The court then ruled, as it had before, there was no vote trading and, thus, no misconduct. The court further found, even if there were misconduct, it was not prejudicial because Franklin had voted no on each of the liability questions, which were all answered nine-to-three in favor of Rael. In its written ruling the court stated, "Based on the above-discussed evidence, the Court found that there was no offer to change votes on certain questions on the Special Verdict Form in exchange for the changing of votes on other questions. There is no evidence that any juror voted 'yes' as to liability in exchange for a finding that some or all of the defendants were not liable for punitive damages. [¶] As to whether any misconduct resulted in prejudice against Defendants, as stated above, the Court found that there was no misconduct. There is no evidence that Ms. Franklin changed her vote to 'yes' on Question 19 as she voted 'no' on this question."

---

"None of the jurors engaged in vote trading, and no one talked about voting a certain way on questions if other jurors voted a certain way on other questions."

Turning to damages, the court found the $3 million in noneconomic damages adequately supported by Dr. Glaser's testimony regarding the impact Rael's termination had on her. On the issues relating to punitive damages, the court reviewed the history of defendants' limited production of financial documents, the court's several comments regarding the inadequacy of that production and its view of the defendants' repeated failure to remedy those deficiencies. It ruled the evidentiary sanctions imposed were appropriate and narrowly tailored to fit the nature of the violations it had found. Finally, as to the amounts awarded by the jury, the court observed there were multiple indicia of reprehensibility that justified the jury's decisions.

The court subsequently granted Rael's motions for prejudgment interest on noneconomic damages ($483,380.90), attorney fees ($1,876,828.75) and costs ($534,212.37).

## DISCUSSION

1. *The Employee Age Data Evidence Was Relevant*

A recurrent theme of Rael's case was that Danaher Corporation and its subsidiaries targeted older employees with systematic harassment with a goal of forcing them to leave, as Rael did, in order to replace them with lower-salaried, younger employees. Once the court permitted Rael to introduce anecdotal evidence to support her theory, evidence to rebut it by showing the dental platform companies had actually hired a similar or larger number of employees over 40 than they had laid off from 2011 through 2017 unquestionably satisfied the threshold requirement for relevance. (Evid. Code, § 210 [relevant evidence includes evidence having any tendency in reason to "disprove any

24

disputed fact that is of consequence to the determination of the action"].)

The trial court may have been correct that evidence relating directly to the hiring and separation of employees in SybronEndo, the small group where Rael had worked, would be particularly significant to the issue of liability before the jury and that specific information concerning the age of employees who replaced older employees would be more probative than generalized data regarding platform-wide hiring and layoffs. Both of those observations, however, went to the weight of the evidence, not its admissibility, particularly since Rael was suing Danaher Corporation and its principal subsidiaries, not just SybronEndo or its immediate corporate parent. To the extent the court excluded defendants' exhibits for lack of relevance, that ruling was so clearly erroneous as to be arbitrary. (See *People v. Young* (2019) 7 Cal.5th 905, 931 [appellate court reviews a trial court's decision to admit or exclude evidence for abuse of discretion; a ruling ""will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice""]; *People v. Powell* (2018) 5 Cal.5th 921, 951 [same].)

2. *Defendants Proffered an Adequate Foundation*

The court's ruling that defendants failed to present a sufficient foundation for the exhibits, which rested on an erroneous understanding of governing law, was equally flawed. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 319 [exclusion of evidence based on a misunderstanding of foundation requirements reviewed de novo]; see *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 [although we review evidentiary rulings that involve evaluating particular

facts and applying established law to those facts for an abuse of discretion, to the extent the trial court's decision depends on the proper construction of provisions of the Evidence Code, "the issue is a question of law, which we review de novo"].)

Computer printouts are admissible when the information they contain falls within the business records exception to the hearsay rule.  (*People v. Zavala* (2013) 216 Cal.App.4th 242, 246; *People v. Lugashi* (1988) 205 Cal.App.3d 632, 641-642; see Evid. Code, § 1552, subd. (a) ["[a] printed representation of computer information or a computer program is presumed to be an accurate representation of the computer information or computer program that it purports to represent"].)  Four conditions must be satisfied for a writing to qualify as a business record:  "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1271.)

Contrary to the trial court's ruling, this language makes clear a custodian of records from defendants' technology department was not required to lay the foundation for introduction of the exhibits.  Rather, "'any "qualified witness" who is knowledgeable about the documents may lay the foundation for introduction of business records—the witness need not be the custodian or the person who created the record.' [Citation.]  Thus, a qualified witness need not be the custodian, the person who created the record, or one with personal knowledge in order for a business record to be admissible under the hearsay exception."  (*Estate of O'Connor* (2017)

16 Cal.App.5th 159, 170; accord, *Jazayeri v. Mao, supra*, 174 Cal.App.4th at p. 324; see *People v. Selivanov* (2016) 5 Cal.App.5th 726, 775 ["'The key to establishing the admissibility of a document made in the regular course of business is proof that the person who wrote the information or provided it had knowledge of the facts from personal observation.' [Citation.] The witness called to present this proof 'need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed'"].)

As defendants adequately demonstrated, human resources manager Pena was fully qualified to provide the foundation for the three exhibits at issue. She testified the companies recorded information regarding employees' dates of birth, provided by the employees themselves, for insurance, pension-eligibility and other benefit-related reasons and she was responsible for maintaining those data, which are stored on an electronic data system. She also explained the exhibits containing the age data were prepared with the assistance of a human resources analyst, who actually ran the reports, while she "was there with her, and I oversaw it." Thus, unlike the witnesses in *People v. Selivanov, supra*, 5 Cal.App.5th 726, which Rael cites, who could not offer the jury any information about the identity and mode of preparation of the particular computer-generated documents offered as an exhibit (*id.* at p. 775), Pena had the knowledge necessary to satisfy Evidence Code section 1271's foundation

27

requirements for admission of exhibits 433, 434 and 435 as business records.[13]

Rael's argument the data as reflected on the exhibits do not demonstrate "the statistical average age of comparable employees in production control" and no defense expert witness had been identified to explain the data, "a necessity in calculating averages or variances over time," purported deficiencies not identified by the trial court when excluding the evidence, like the court's ruling on the relevance of the exhibits, misses the point. At most, these purported shortcomings go to the weight, not admissibility, of the evidence. The data, with a little basic arithmetic (determining age from birthdates and counting numbers), were relevant to contest Rael's anecdotal evidence of systemic discrimination against older employees.[14] Defendants offered a

---

[13] *People v. Matthews* (1991) 229 Cal.App.3d 930, also cited by Rael, is similarly inapposite. In that case the court excluded evidence where "no testimony was adduced about how they were prepared or the sources of information used for the entries made." (*Id.* at p. 940.) Pena provided that information. (See *ibid.* ['[h]ad White identified the sources of information and the mode of preparation of the computer lists, the reliability and trustworthiness of the records would have been established"].)

[14] Each page of the three exhibits had 13 columns for each individual employed in California by one of the three companies between January 1, 2011 and June 23, 2017 listing the employee's operating company (Kerr Corporation, Ormco or Sybron Dental), computer identification number, gender, birth date, department, location, job title, grade, supervisor, salary, hire date, termination date (if applicable) and termination reason (if applicable). Rael's information is included on the first page of

28

lay witness (one of their vice presidents, Curt Bludworth) to provide that testimony based on the actual numbers.  (See *People v. Lindberg* (2008) 45 Cal.4th 1, 45 [expert testimony is not needed when a topic is so common that factfinders of ordinary knowledge and education could reach a reasonable conclusion without an expert's assistance]; see also Evid. Code, § 801, subd. (a) [expert opinion is limited to subjects that are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)  Whether it would have been more powerful to have an expert do additional analyses and explain in greater detail the significance of the exhibits is a matter of trial tactics not germane to our analysis of their admissibility.

Moreover, neither Rael's claim of a profit-induced effort to replace older employees with lower-cost younger ones nor the evidence she presented to support her theory was ever limited to production employees.  To the contrary, her counsel in his closing argument referred broadly to Danaher Corporation's 71,000 employees and suggested defendants' efforts to force out older employees applied to at least 10 percent of them.

3. *Exclusion of the Evidence Prejudiced Defendants*

Throughout the case, from opening statement through closing argument, Rael's counsel insisted that Danaher Corporation and its subsidiaries had, on a company-wide basis, targeted older employees and, therefore, that each of the defendants was responsible for the age-based harassment and discrimination suffered by Rael.  That theme of systemic

---

exhibit 434.  The data were provided to Rael during discovery in digital form.

discrimination to reduce employee costs was reinforced in closing argument when Rael's counsel emphasized the absence of the evidence defendants were precluded from introducing by the court's erroneous rulings:  "You'd think if defense had any defense to this issue, any way to prove that this was not an age-motivated work environment where older workers were not looked at well, they would have done something about that.  They would have shown you [that] evidence.  Of course they would.  But they didn't.  From that fact itself, as the law indicates, you can draw an inference adverse, clearly adverse to the defense."

The significance of this missing evidence was likely magnified by defense counsel's broken promise, made in his opening statement, that it would be presented, "Her lawyer told you there was some companywide plan to get rid of older workers.  The numbers don't lie.  You'll see data showing that the number of employees over age 50 stayed the same or went up.  After Codie Rael left and before Codie Rael left, the numbers were the same.  There just isn't any data showing that there was a purge of older employees."

Defendants had that evidence, but were not permitted to present it to the jury.  The potential significance of that excluded evidence to rebut Rael's theory of the case cannot be overstated.  And the jury's decision not only was closely divided (nine-to-three) on liability but also, as discussed, was reached only after several days of contentious debate and deadlock finally broken by discussions that, at the very least, may have bordered on improper vote trading.  In view of these factors, it is reasonably probable the erroneous exclusion of exhibits 433, 434 and 435 affected the Phase I outcome.  (See *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 ["trial error is usually

30

deemed harmless in California unless there is a 'reasonabl[e] probab[ility]' that it affected the verdict"]; *Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 824 [same]; see also Evid. Code, § 354 [erroneous exclusion of evidence justifies reversal of a judgment only when it resulted in a miscarriage of justice].)

## DISPOSITION

The judgment in favor of Rael, including the award of prejudgment interest, attorney fees and costs, is reversed; and the matter is remanded for a new trial.  The parties are to bear their own costs on appeal.


PERLUSS, P. J.

We concur:



SEGAL, J.



FEUER, J.

31